(No. 91496.—

FRED EYCHANER *et al.*, Appellees, v. THEODORE GROSS *et al.*, Appellants.

*Opinion filed October 3, 2002.*

230

RARICK, J., took no part.

Stanley B. Eisenhammer, of Hodges, Loizzi, Eisenhammer, Rodick & Kohn, of Arlington Heights, for appellant Theodore Gross.

William F. Conlon, Susan A. Stone and Neil Wyland, of Sidley, Austin, Brown & Wood, J. Timothy Eaton, of Ungaretti & Harris, and David A. Epstein, all of Chicago, for appellant Roosevelt University.

William R. Quinlan, James R. Carroll, James A. Niewiara, Jean M. Prendergast and Martin J. O'Hara, of Quinlan & Carroll, Ltd., and Donald B. Hilliker and Marie A. Halpin, of McDermott, Will & Emery, all of Chicago, for appellees Fred Eychaner and Berry Lou Weiss.

Terry M. Grimm, Julie A. Bauer and Mary Pat Benz, of Winston & Strawn, of Chicago, for appellee Auditorium Theatre Council.

Frank G. Mares, of Chicago, for *amicus curiae* DePaul University.

Mary Anne Smith, of Chicago, for *amicus curiae* Illinois Institute of Technology.

Richard F. Friedman, of Chicago, for *amicus curiae* Landmarks Preservation Council of Illinois.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiffs, Fred Eychaner and Betty Lou Weiss, were directors of the Auditorium Theatre Council (Council). Plaintiffs brought an action against defendants, Roosevelt University and its president, Theodore Gross (collectively Roosevelt), in the circuit court of Cook County. In the claims and counterclaims that developed in this case, the Auditorium Theatre Council, Inc. (ATC Inc.), and Roosevelt, respectively, asserted their authority to control and operate the Auditorium Theatre (Theatre). Specifically, plaintiffs and ATC Inc. claimed that Roosevelt placed the right to control and operate the Theatre into a charitable trust with ATC Inc. as trustee.

At the close of a bench trial, the trial court found in favor of Roosevelt and rejected all theories supporting ATC Inc.'s control of the Theatre. The trial court, *inter alia*, declared Roosevelt the sole and exclusive owner of the Theatre. The court also ordered an accounting of ATC Inc.'s funds to separate public donations from operating revenues.

The appellate court, with one justice dissenting, reversed these orders and remanded the cause for further proceedings. 321 Ill. App. 3d 759. We allowed defendants' petition for leave to appeal. 177 Ill. 2d R. 315(a). We now reverse the judgment of the appellate court, affirm the order of the trial court, and remand the cause to the trial court for further proceedings.

## BACKGROUND

During the 10-week bench trial, the court received

approximately 400 documents and heard testimony from 37 witnesses, all of which generated 98 record volumes. The bench trial adduced the following facts.

## Setting

The Auditorium Building is located in downtown Chicago, bordered by Michigan Avenue on the east, Congress Parkway on the south, and Wabash Avenue on the west. The building was designed and built in the late nineteenth century by the renowned architects Louis Sullivan and Dankmar Adler. The building originally contained a hotel, commercial office space, and the Theatre, which comprises approximately 40% of the entire building. The Auditorium Building, including the Theatre, with its near-perfect acoustics, was recognized as an architectural masterpiece. However, by the end of World War II, the building, including the Theatre, was abandoned and in a state of disrepair.

## Cast

In 1945, Roosevelt was incorporated as an Illinois not-for-profit corporation. In 1946, it became possible for Roosevelt to purchase the Auditorium Building and, to that end, the University solicited and received donations. In 1947, Roosevelt purchased the building, protected the Theatre from further deterioration, and converted the remaining space for use as Roosevelt's campus.

In the mid 1950s, Roosevelt began exploring ways to restore the Theatre. On September 11, 1958, a committee of Roosevelt's board of trustees recommended to the full board that a separate not-for-profit corporation be created to restore and operate the Theatre under that corporation's "trusteeship." On September 25, the full board rejected the proposal amid concerns of giving away rights to the University's property. The board recommended that "[t]he University should remain the 'trustee' of the Auditorium Theatre."

At a December 4, 1958, board meeting, trustee Beatrice Spachner submitted "a plan for the restoration of the Auditorium Theater and its operation under the auspices of Roosevelt University." On February 17, 1959, Roosevelt's board of trustees established the Auditorium Restoration and Development Committee (ARDC), composed of Roosevelt Board members and faculty, and community representatives. The ARDC was directed to examine Spachner's Theatre restoration plan.

On October 29, 1959, the ARDC reported to Roosevelt's board of trustees. At that meeting, the board passed a motion tentatively approving a fund drive to restore the Theatre, subject to the following conditions: that the committee's fund-raising efforts not impair Roosevelt's financial resources or credit; that Roosevelt's legal counsel recommend to the board "the legal entity and manner of contract" that would enable Roosevelt to obtain its objectives; and "[t]hat the University not lose ownership or control of the Auditorium Theatre."

The ARDC oversaw the drafting of a resolution to implement the fund drive. Attorney Elmer Gertz was the principal drafter of the resolution. In a letter dated January 21, 1960, Gertz asked Kenneth Montgomery, Roosevelt's attorney, to review the draft resolution. Gertz stated:

"[A] draft of the resolution has been agreed upon. I am sending a copy of it herewith. It is the consensus of all involved in this situation that it is best *not to form* any separate corporation, foundation, *trust* or other legal entity, but to proceed in the manner set forth in the resolution." (Emphases added.)

Gertz asked for Montgomery's ideas on the resolution, specifically on the subject of tax exemption.

The ARDC presented the draft resolution to Roosevelt's trustees at their February 11, 1960, board meeting. The proposed resolution renamed the ARDC the Auditorium Theatre Council (Council) and authorized it

to raise funds for and to restore the Theatre. Several trustees continued to express concerns that the proposed resolution was not sufficiently explicit in its description of Roosevelt's control over the ARDC. They questioned whether the resolution complied with the board's October 29, 1959, motion that Roosevelt "not lose ownership or control of the Auditorium Theatre." Criticizing the proposed resolution, trustee Lerner stated that the "Theater would be given away in perpetuum, under this proposal. No [Roosevelt] trustee who understands the word 'trust' should vote for it."

As reflected in the minutes of the board meeting, Gertz responded to these concerns:

> "[Gertz] was not attempting to make policy for the Board, he said, but had simply tried to realize its intent as derived from the Board's own earlier resolutions and statements of policy. He went on to say that no separate corporation had been proposed because this arrangement would be even more subject to the objection that the University would be prevented from exercising control over the Auditorium. He asserted that any action taken by the proposed Auditorium Council could be changed or rescinded by the Board of Trustees."

The resolution was tabled to allow the ARDC to address the concerns that had been raised.

On February 18, 1960, the ARDC presented a revised resolution to Roosevelt's board of trustees. The revision renamed the ARDC the Auditorium Theater Council. The revision made Roosevelt's control more explicit and further limited the authority of the Council. Language stating that the Council would "fully control" the fund-raising, restoration, maintenance, management, and programming for the Theatre was deleted, leaving the Council only "responsible" for fund-raising and restoration and "charged with the responsibility of carrying out the details of" the fund-raising campaign and the management, programming, and operation of the Theatre. Language that would have allowed the Council to

"adopt such procedures *** as it may deem necessary" was dropped. Language was added to ensure Roosevelt board approval, on an annual basis, of all new members to the Council's executive committee. Language was added to ensure the board's involvement in establishing a development reserve amount for the Theatre, with all Theatre revenues above that amount being transferred to Roosevelt's unrestricted funds. Language was added requiring the Council to make periodic progress reports regarding the restoration to the board, to provide information requested by the board, to make annual reports of operations to the board, and to submit to an annual audit by accountants. Finally, language was added requiring that the actions and programming of the Council "be in harmony with the aims of the University in serving the educational and cultural aspirations of the community."

The revised resolution, as quoted in the minutes, reads in its entirety:

" 'Resolved, that it is the intent of the Board of Trustees of Roosevelt University, for and on behalf of the University to implement as described hereinafter the plan for the restoration and operation of the Auditorium Theater which was submitted by the [ARDC] to the Board at its meeting of October 29, 1959, and incorporated in its minutes of that date.

IT IS, THEREFORE, ORDERED

(1) That the [Council] be now authorized and directed to take such steps as it may deem necessary to carry out a fund drive for the restoration of the Theater with due regard for safeguarding the right, title and interest of the University in and to the Theater and protecting the resources and credits of both the University and the Council.

(2) That the Council be responsible for raising funds for the restoration of the Theater and for the supervision and administration of its restoration.

(3) That the Council be empowered to secure the

services of a professional fund-raising executive and staff to guide and operate the campaign for funds.

(4) That the Council have authority to supervise the work of reconstruction, select engineers, architects, contractors, approve plans and specifications and contract and pay for the work performed, making periodic progress reports to the Board and providing requested information.

(5) That a special fund be established to be known as the Auditorium Restoration Fund, segregated and separate from other funds of the University, that contributions for the restoration be deposited in this fund, and that the fund be used for no other purpose than the restoration and operation of the fund drive.

(6) That the Council not contract, purchase or enter into obligations of any kind with any supplier or other person for the furnishing of work, services, or materials, or for any other purpose, unless funds or pledges are available for that purpose, and unless arrangements with any such person are in a form approved by legal counsel and embody the following provisions, among others, (a) a waiver of mechanics' liens; (b) the contracting parties will look only to the Restoration Fund for payment and not to any other fund of the University; and (c) the contracting parties will not hold the University nor any member of the Council or University liable or any reason whatsoever.

(7) That the Council nominate for Board approval persons of its selection to be members of an Executive Committee charged with the responsibility for carrying out the details of the fund-raising campaign and for the management, maintenance, budgeting, programming, financing and operation of the restored Auditorium Theater.

(8) That until such time as the Executive Committee of the Council is formed the Executive Committee of the [ARDC], members of which have already been approved by the Board, be responsible for the fund-raising campaign.

(9) That the Executive Committee of the Council be composed of not more than 25 persons; that the initial membership of the Executive Committee be divided into three groups, with terms ending respectively in 1961, 1962, and 1963; and that the Council nominate annually persons for Board approval to serve terms of three years as the initial terms of the original group end.

(10) That the Executive Committee of the Council organize itself and select such officers and committees as it deems necessary.

(11) That after the restoration of the Theater, any funds remaining in the Auditorium Restoration Fund be transferred to an Auditorium Theater Operating Fund to be used only for the maintenance and operation of the Theater and be disbursed by direction of the Executive Committee of the Council.

(12) That any surplus resulting from the operation of the Theater be retained in a development reserve, and that when an adequate sum, as determined by the Executive Committee of the Council in consultation with the Executive Committee of this Board, has been accumulated, any amount above that reserve be transferred to the unrestricted funds of the University.

(13) That the actions and programming of the Council be in harmony with the aims of the University in serving the educational and cultural aspirations of the community.

(14) That the Council or Executive Committee not conduct any capital, operating or maintenance fund-raising campaign other than the initial Restoration Campaign without consent of the Board.

(15) That the Council through its Executive Committee prepare annual reports of its operations for the Board, and that an annual audit of the Council's operations be made by a firm of certified public accountants.' "

Discussion on the resolution followed.

Some trustees proposed additional amendments based on their concerns that the revised resolution did not sufficiently describe the control that the University would have over the Council. Kenneth Montgomery, Roosevelt's attorney, opposed any additional amendments as unnecessary. He described the Council as an "agency" of the University and assured the board that nothing would "prevent the Board of Trustees from 'deactivating' the Auditorium Council and Committee [ARDC], who would owe their origin and authority to the Board."

Trustee Gerald Gidwitz, an ARDC member and sup-

porter of the revised resolution, similarly assuaged the board as reflected in the minutes:

"The Committee [ARDC] considered that adequate protection for the University's interest inhered in the Board of Trustees' right to reconstitute or abolish the Auditorium Council and Committee, or to alter, modify, or abolish its powers in any way that the Board of Trustees might see fit. He said that the Board could change its mind about the terms of the resolution at any time in the future and he therefore urged that the resolution be passed without amendment."

In response to a request, Gidwitz agreed that his statement "could be incorporated in the minutes as reflecting the agreed understanding within the Board on the control which the Board could exercise over the Auditorium Council and [its] Executive Committee."

Upon this agreed understanding, the Roosevelt University board of trustees rejected the proposed amendments. The board adopted the revised resolution by a vote of 18 to 7.

Subsequent to the February 18, 1960, board meeting, Montgomery wrote a letter to the United States Internal Revenue Service (IRS), in which he sought a determination on behalf of Roosevelt that contributions to the Council would be tax deductible. Montgomery asked the IRS to grant Roosevelt's request because contributions to the Council were "in fact contributions to [Roosevelt] because the Council is its agent." The IRS ruled that contributions to the Council would be tax-deductible to the donor, stating: "Since it appears that contributions to the Council will inure entirely to your [Roosevelt's] benefit such contributions will be considered contributions to you."

The Council employed architects, engineers, construction experts and others to determine a plan to restore the Theatre. The cost of restoration was estimated at a minimum of $2.75 million. Roosevelt would often advance

funds for the restoration of the Theatre. On October 31, 1967, the Theatre was reopened to the public.

The Council operated the Theatre under the supervision and control of Roosevelt. At the March 4, 1971, meeting of Roosevelt's board of trustees, Chairperson Jerome Stone reported that Standing Policies and Operating Procedures (SOPs) had been developed for the Theatre. According to the minutes, Stone reported: "This statement reaffirms and supplements the Board's resolution of February 18, 1960 establishing the Council." At its April 22, 1971, meeting, the board approved the SOPs. They mandated procedures the Council was to follow for the day-to-day operation of the Theatre and further secured the University's control over Theatre operations. For example, the SOPs mandated that all Theatre employees be paid by the University and be subject to University regulations.

In the late 1970s, some Council members posited that fund-raising for the Theatre would improve if the Council could obtain its own tax-exempt status from the IRS. According to the minutes of the December 20, 1977, meeting of the Council's executive committee, the Council and Roosevelt were discussing "the establishment of a 'Shell Corporation' for the purpose of separate tax-exempt status of the [Council]."

Robert Gorman, the University's attorney, revised a draft of the articles of incorporation and bylaws of the proposed corporation. In a letter dated October 22, 1979, Gorman opined:

> "In review, the Articles of incorporation and By-laws establish a separate Illinois not-for-profit corporation named the Auditorium Theatre Council. It is explicitly set forth in the Articles of Incorporation and in the By-laws that this new corporation is for fund raising purposes only and has no duties, rights, or operating responsibilities in connection with the Auditorium Theatre. ***

\* \* \*

If the Board of Trustees approves the establishment of a new corporation, the Auditorium Theatre Council will exist in two legal capacities. In one capacity it will continue to exist as it has in the past as an unincorporated agency of Roosevelt University operating under, and subject to, the direction and control of the Board of Trustees of Roosevelt University. The books and accounts of the Auditorium Theatre Council will also continue to be subject to inspection by[,] and among the fiscal responsibilities and duties of[,] the Roosevelt Controller. The use, maintenance, operation and restoration of the Auditorium Theatre will continue in the identical fashion it has always done pursuant to the Resolution of the Board of Trustees of Roosevelt University dated February 18, 1960, and the [1971 SOPs].

In its other legal capacity the Auditorium Theatre Council will exist as an Illinois not-for-profit corporation in accordance with the Articles of Incorporation and By-laws submitted. It will use the name 'Auditorium Theatre Council.' However, the corporation will exist and be used for the solicitation of funds only. It will not affect in any way whatsoever the operations of the *** Council and the *** Theatre which will continue in the same manner as in the past."

Gorman concluded that the articles of incorporation and bylaws of the proposed corporation, Auditorium Theatre Council, Inc. (ATC Inc.), "are satisfactory and not in conflict with the interests of Roosevelt University."

Beatrice Spachner, University trustee and chairperson of the Council, reported on the Council's fund-raising efforts at the October 25, 1979, meeting of Roosevelt's board of trustees. She stated that potential donors hesitated to contribute to the Council because it was not separately identified as a not-for-profit corporation organized for tax-exemption purposes. According to Spachner: "To overcome this concern of contributors, it was concluded that an affiliate of the Council should be incorporated only for the purpose of raising funds *** for the restoration, operation and maintenance of the Auditorium Theatre. *** [T]his will be the only function of the Corporation."

Both the Council and ATC Inc. would share similar names, and would have largely the same membership. However, the resolution authorizing the incorporation of ATC Inc. expressly stated:

"This corporation is authorized for fund raising purposes only. The corporation will have no rights whatsoever for the use, operation, maintenance, or restoration of the Auditorium Theatre. The use, operation, maintenance and restoration of the Auditorium Theatre will continue, without change, to be the responsibility of the Auditorium Theatre Council in its separate legal capacity as an unincorporated agency of Roosevelt University subject to the control of the Roosevelt University Board of Trustees as set forth in the [1971 SOPs]. *** In the event that at any time in the future [ATC Inc.] should exceed any of the duties, rights, or powers granted it by this resolution, the Board of Trustees hereby reserves the right to terminate any uses, duties or rights of [ATC Inc.] in connection with the *** Theatre."

Roosevelt's board of trustees adopted the resolution.

On September 8, 1981, ATC Inc. filed its articles of incorporation with the State of Illinois and was incorporated under the General Not For Profit Corporation Act (see 805 ILCS 105/101.01 *et seq.* (West 2000)). According to its articles of incorporation, ATC Inc.'s corporate purpose was, in pertinent part:

"To raise funds and gifts from individuals and organizations for the restoration, operation and maintenance of the Auditorium Theatre *** and the presentation of educational, civic and cultural programs therein, with due regard for safeguarding the right, title and interest of Roosevelt University in and to the Theatre, so that it will serve as a cultural center for the people of Chicagoland."

ATC Inc. subsequently obtained an IRS ruling that ATC Inc. was a tax-exempt organization and that donations to it would be tax-deductible by the donor.

Subsequent to the incorporation of ATC Inc., the University updated the 1971 SOPs. The 1983 SOPs stated in pertinent part:

"The purpose of the *** Council is to maintain, operate and continue the restoration of the internationally famed Auditorium Theatre of Roosevelt University. The Council will operate the Theatre for the benefit of the faculty and students of Roosevelt University and also, subject to the academic priorities of the University, to make artistic, cultural and educational contributions to the people of Greater Chicago through the sponsorship of events in the performing arts."

The 1983 SOPs are substantially similar to those of 1971. Significantly, the 1983 SOPs distinguish the identity and the function of the Council from those of ATC Inc. The 1983 SOPs recount that the University created the Council through the 1960 resolution of Roosevelt's board of trustees and that the University created ATC Inc. through the board's October 25, 1979, resolution. The 1983 SOPs state that the "sole purpose" of ATC Inc. "is to solicit funds for the Auditorium Theatre."

Dialogue

The University paid the Theatre's operating costs, such as insurance and employee payroll, from the University's general account. Roosevelt was supposed to be repaid from the Theatre revenue account. However, by the late 1980s, the Theatre's operating expenses exceeded its revenues. The Theatre lost more money than fund raising could offset. The general funds that Roosevelt expended were not reimbursed. Theatre losses and the operating deficit increased. Roosevelt paid this deficit by transferring money from its endowment fund to Theatre accounts.

On July 1, 1986, Roosevelt trustee Robert Mednick met with Council chairperson Jack Whitney to discuss this problem. According to a July 7, 1986, letter from Mednick to Whitney, they agreed that if the Theatre's cumulative operating deficit increased over approximately $250,000, the Theatre would be discontinued due to a lack of community support. An April 29, 1987, letter by a

Council officer reflected the understanding that if the cumulative deficit exceeded this amount "at any time, Roosevelt may close down the Council."

The Theatre's cumulative operating deficit eventually totaled over $400,000. However, despite the above-stated understanding, the University kept the Theatre open and continued to support the Theatre. Eventually, during the 1990s, the Theatre attracted large Broadway productions such as "Miss Saigon," "Les Miserables," "Phantom of the Opera," and "ShowBoat." These productions and other popular programs enabled the Council to increase its revenues from ticket sales and to repay the funds transferred to the Theatre accounts from the University's other accounts.

## Strife

Beginning in the late 1980s, the Council and Roosevelt disputed their respective rights over the Theatre. As reflected in a November 15, 1988, letter from Council chairperson Edward Weil to University President Gross, the Council recognized signs of success. "Things are coming together nicely in the operation of the Theatre and at the same time the Council is starting to get the favorable recognition it deserves, and is beginning to tap into major funding sources." However, a June 26, 1989, memo from Gross to a committee of University trustees reflected the University's view: "The distinction that must continually be made is between *authority* and responsibility: the RU Board of Trustees has *authority* over the Theatre; the [Council] has the *responsibility* to manage the Theatre." (Emphases in original.)

A rift grew between the parties. In 1989, Roosevelt informed the Council that a Council fund-raising campaign, initiated without the approval of Roosevelt's board of trustees, possibly violated the 1983 SOPs. At the April 14, 1989, meeting of the Roosevelt board, Gross reported this and other violations. He suggested options including

"[d]rawing up a new agreement that retains our owner-ship of the theatre but that establishes the [Council] as a no[t]-for-profit, separate corporation which pays $1 a year rent to the university and is responsible for its own operating budget and its own fund-raising."

On July 10, 1989, the Council's executive board agreed with Gross' recommendations. The group also concluded that the Council should continue to manage the day-to-day operations of the Theatre.

At its July 20, 1989, meeting, the Roosevelt board of trustees approved a resolution concerning "the organiza-tional structure between Roosevelt University and the Auditorium Theatre." The resolution stated that the Council "has responsibility for the artistic direction of the Theatre and the executive director of the Theatre reports directly to the president of the University with regard to budgetary and general operating matters."

The Council viewed this resolution essentially as Roosevelt transferring authority for managing the Theatre from the Council to Roosevelt. The Council's executive board rejected Roosevelt's resolution.

On August 1, 1989, the Council's executive board presented to Roosevelt a proposal to change the relation-ship between the University and the Council. The proposal acknowledged that Roosevelt owned the The-atre. Under the proposal, subject to conditions such as repayment of funds to Roosevelt, the Council would be disbanded and all operating authority would be trans-ferred to ATC Inc., which would conduct fund-raising independently of the University. Roosevelt rejected this proposal.

On August 24, 1989, the Council's executive board resigned. The Council assumed "no further responsibil-ity" for Theatre operations and advised University trustees to prepare to do so.

As a result of this discord, Roosevelt and the Council

reached a disharmonious decision. The Council would continue its day-to-day operations of the Theatre; members of the Council's executive board rescinded their resignations; and Gross was elected chairperson of the Council. At its October 10, 1989, meeting, Roosevelt's board of trustees approved the following resolution:

"The Auditorium Theatre is an aesthetic and financial asset of Roosevelt University, an integral unit led by an Executive Director who reports to the President of the University. The President serves as Chairman of the Auditorium Theatre Council. The Executive Director is assisted by the Auditorium Theatre Council in programming, fund-raising, special events, and other activities directly related to the Theatre.

Although Roosevelt University retains final authority over all matters pertaining to the Auditorium Theatre, the Board of Trustees recognizes that the Auditorium Theatre Council must remain as autonomous as possible, contingent upon sound fiscal management. The University endorses the concept that Roosevelt University and the Auditorium Theatre are one entity. Roosevelt University wishes to assist the Auditorium Theatre in all of its efforts and supports the principle that, as a matter of first priority, all revenues raised in its behalf be placed in the account of the Auditorium Theatre for its continuing advancement.

The Auditorium Theatre should now be presented as the Auditorium Theatre of Roosevelt University."

Whatever understanding the parties may have reached faltered from the beginning. Roosevelt and the Council constantly disputed their respective powers over the Theatre and the ownership of the Theatre's operating revenues.

Throughout the early 1990s, the parties conducted continuous negotiations regarding various forms of agreements to change their relationship to each other and to the Theatre. For example, in 1991, John Blew, Council and ATC Inc. secretary, presented another proposal for transfer of Theatre operations from the Council to ATC Inc. His proposal included several justifications. First,

pointing to the Council's board, Blew stated that the Council had an opportunity to move the board's composition "into a higher tier by attracting a group of more influential and higher profile members who both have more money themselves and, perhaps more important, have greater *access* to other sources of major funding." (Emphasis in original.) Blew posited that it was "essential for such broad development that there be a separate legal entity and organization with its own identity and mission in place. The 'heavy hitters' we are talking about will simply not lend their names and prestige to an 'advisory committee' or anything of the sort." Blew suggested that operating the Council through ATC Inc. was a necessary condition to strengthening the Council's board.

Blew also recommended that the relationship between the Council and ATC Inc. be clarified. According to Blew: "The minutes of meetings of the two 'mirror' organizations which now exist—the unincorporated association and the corporation—are not in acceptable shape. Most of our own board members don't really know or understand the organizational structure." Blew continued that "if producers, artists and vendors were aware of the structure or lack thereof, they might be reluctant to enter into contracts with respect to the Theatre. It is not a healthy situation, and it is one which should not be permitted to continue."

In the course of his proposal, Blew acknowledged: "There is no question but that the University owns the Theatre and controls the Council—period." Roosevelt rejected the proposal.

Through 1993 and 1994, Roosevelt and ATC Inc. discussed a license or lease agreement under which Roosevelt would transfer Theatre operations to a reorganized ATC Inc. On June 22, 1993, ATC Inc. sent a letter to the IRS inquiring into the corporation's tax-exempt status if

it took over Theatre operations. In the letter, ATC Inc. represented to the IRS, under penalty of perjury, that the Council operated the Theatre as a "part" of, or "unit within," the University since 1960 and that a "proposal" had been made to transfer Theatre operations to ATC Inc. prospectively. The IRS determined that the proposed reorganization would not affect the tax-exempt status of ATC Inc. By December 1994, the parties had agreed on neither the terms of a license nor the makeup of the proposed reconstituted ATC Inc.

During this time, ATC Inc. made additional proposals to Roosevelt regarding the Theatre. In mid-1994, ATC Inc. offered to purchase the Theatre from Roosevelt for $1 million, but the University rejected the offer. In November 1994, ATC Inc. offered to purchase the Theatre for $3 million, which offer the University rejected.

At a December 15, 1994, meeting of the Council's executive committee, Gross requested that the committee recommend the transfer of $1.5 million out of the $3 million then contained in the Theatre's operating accounts into Roosevelt's general accounts. Roosevelt wanted to use the $1.5 million to finance its new Schaumburg campus. The money would be transferred from the Theatre's operating revenues and not from contributions. The Theatre's executive director stated at this meeting that the transfer would not impair Theatre operations. ATC Inc. members objected to the transfer. It was agreed that no action would be taken on the request pending receipt of an opinion from Roosevelt's counsel regarding the legality of the proposed transfer.

### Adversaries

The next day, plaintiffs brought this lawsuit. In July and November 1995, the Roosevelt University board of trustees approved resolutions that: (1) dissolved the Council; (2) withdrew any and all powers given to ATC

Inc.; and (3) authorized a new not-for-profit corporation to manage and operate the Theatre, known as the Auditorium Theatre of Roosevelt University (AT of RU).

In their complaint, plaintiffs sought an injunction prohibiting defendants and ATC Inc. from directing the transfer of any money from ATC Inc. to Roosevelt for non-Theatre purposes. Also, plaintiffs sought a declaration that Roosevelt had placed the Theatre "in the public domain for the benefit of the people of Chicagoland," with the Council and its successor, ATC Inc., as trustee. Plaintiffs also sought a declaration that, *inter alia*: ATC Inc. had legal title to all funds donated and all revenue generated from its operations; any transfer of money from ATC Inc. to Roosevelt for non-Theatre purposes would violate the articles of incorporation and bylaws of ATC Inc.; and such transfer would violate the General Not For Profit Corporation Act of 1986 (805 ILCS 105/ 101.01 *et seq.* (West 2000)).

Roosevelt filed an answer, in which the University raised defenses. Roosevelt claimed that ATC Inc.'s sole corporate purpose was to raise funds for the Theatre and that the board of trustees of the University, the owner of the building, had never granted ATC Inc. authority or power to restore, maintain, or operate the Theatre. Roosevelt also claimed that ATC Inc. did not succeed the Council created in 1960. Among its defenses, Roosevelt claimed: "[T]here is absolutely no legal doctrine involving the dedication of private property to the 'public domain,' at least without a governmental taking through a condemnation proceeding with just compensation."

Roosevelt also filed a counterclaim against plaintiffs and ATC Inc. for declaratory and injunctive relief. Roosevelt sought a declaration that the University owns all right, title, and interest in the Theatre. Roosevelt sought a further declaration that: the University has the sole power and authority to restore, maintain, and operate

the Theatre; that the University granted a revocable license to the Council to perform those tasks; and that ATC Inc. has no right to perform those tasks, but was created solely for fund-raising purposes. Roosevelt also sought, *inter alia*, an accounting of ATC Inc.'s funds and an injunction to prevent ATC Inc. from operating the Theatre.

ATC Inc. filed its own counterclaim against Roosevelt. The corporation asserted a number of alternative legal theories in support of its claimed control of the Theatre.

The trial court granted Gross' motion to dismiss all claims against him as legally insufficient (see 735 ILCS 5/2—615(a) (West 2000)). Also, granting Roosevelt's motion for partial judgment on the pleadings (see 735 ILCS 5/2—615(e) (West 2000)), the trial court held that: (1) Roosevelt had the authority and right to restore, maintain, and operate the Theatre; (2) ATC Inc.'s sole right is to raise money for the Theatre; and (3) the positive net operating revenues from Theatre performances are the property of the University.

In a Rule 23 order, the appellate court reversed the orders of the circuit court and remanded the cause for a trial. *Eychaner v. Gross*, Nos. 1—95—3614, 1—96—1412 cons. (1997) (unpublished order under Supreme Court Rule 23). The appellate court determined that disputed questions of material fact existed regarding the parties' relationship. The appellate court also held that plaintiffs' claims were legally sufficient.

On remand, plaintiffs and ATC Inc. (hereafter referred to as plaintiffs) amended their pleadings. They, *inter alia*, altered their trust theory to assert an "express trust" of the right to restore, maintain, and operate the Theatre, which they referred to as the "Auditorium Theatre Trust." Plaintiffs maintained their allegations that the Council was the trustee and ATC Inc., as legal

successor to the Council, became, and remains, the trustee. In its counterclaim against Roosevelt and Gross, ATC Inc. alleged, *inter alia*: (1) an express charitable public trust; (2) constructive trust; (3) breach of contract based on the 1960 resolution and SOPs; (4) equitable estoppel; and (5) promissory estoppel.

At the close of a bench trial, on September 28, 1998, the court entered judgment in favor of Roosevelt on its counterclaim and denied plaintiffs' theories of relief. The trial court declared the University to be the sole and exclusive owner of the Theatre. The trial court: ordered plaintiffs to turn over control of the Theatre to the newly formed AT of RU; barred the Council and ATC Inc. from operating and controlling the Theatre; and ordered an immediate accounting of Theatre operations. On September 29, the trial court made an express written finding making these orders immediately enforceable (see 155 Ill. 2d R. 304(a)).

A divided appellate court reversed these orders and remanded the cause for further proceedings. 321 Ill. App. 3d 759. The appellate court held that the trial court's conclusion that there was no express trust was clearly erroneous. 321 Ill. App. 3d at 779. Based on that holding, the court declined to address plaintiffs' alternative claims. 321 Ill. App. 3d at 780-81. A concurring justice wrote separately to disagree with the dissent. 321 Ill. App. 3d at 785 (Cahill, P.J., specially concurring). The dissenting justice concluded: "Because there is enough admissible evidence to support the trial judge's view that this was a takeover attempt by an instrumentality of Roosevelt University, I would affirm his conclusion that there is no trust." 321 Ill. App. 3d at 788 (Wolfson, J., dissenting). We allowed defendants' petition for leave to appeal.[1]

---

[1]We note that plaintiffs, as appellees in this court, claim that this court lacks jurisdiction in this case. Plaintiffs contend that

We subsequently granted leave to DePaul University and the Illinois Institute of Technology to file an *amicus curiae* brief in support of defendants' appeal. We also granted leave to the Landmarks Preservation Council of Illinois to file an *amicus curiae* brief in support of plaintiffs.

## ANALYSIS

### I. Standard of Review

The parties disagree as to our standard of review of the trial court's decision. Defendants contend that we should review the trial court's decision under the "manifest weight of the evidence" standard. Plaintiffs contend that the "clearly erroneous" standard is the proper standard of review. The appellate court employed the "clearly erroneous" standard of review. 321 Ill. App. 3d at 770.

The trial court heard witness testimony and resolved conflicts of fact. In a bench trial, the trial court must weigh the evidence and make findings of fact. In close cases, where findings of fact depend on the credibility of witnesses, it is particularly true that a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence. *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985). The findings of the trial court as to the existence of a trust will not be disturbed on review unless such findings are against the manifest weight of the evidence. *In re Estate of Zukerman*, 218 Ill. App. 3d 325, 330 (1991) (and cases cited therein). This standard also applies regarding

defendants failed to perfect their appeal to this court in compliance with Supreme Court Rule 315(a). The arguments raised in connection with this issue were the very same arguments presented to us in plaintiffs' motion to strike defendants' petition for leave to appeal. We denied that motion, and we see no reason to reconsider our decision.

the existence of an agency relationship. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 47 (1994). A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242 (1996); *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995); *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995). "The court on review must not substitute its judgment for that of the trier of fact." *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991).

Nevertheless, the trial court also construed and ruled on the legal effect of documents. In reviewing the trial court's conclusions of law, we apply a *de novo* standard of review. See *Norskog v. Pfiel*, 197 Ill. 2d 60, 70-71 (2001); *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998); T. O'Neill & S. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512, 516 (1995). We now turn to the merits of the issues before us.

## II. Express Charitable Trust

Plaintiffs claim that the 1960 resolution of Roosevelt's board of trustees, together with the surrounding circumstances, created an express charitable trust with the Council and its successor, ATC Inc., as trustee in charge of restoring and operating the Theatre. The trial court rejected plaintiffs' claim, and concluded that Roosevelt created the Council as its agent for restoring and operating the Theatre. The appellate court reversed and remanded for further proceedings, finding "legal and factual errors in the trial court's resolution of the charitable trust issue." 321 Ill. App. 3d at 771.

Before this court, plaintiffs, as appellees, not only defend the appellate court's judgment, but also request, as cross-relief, that we declare the existence of the alleged trust. We decline plaintiffs' request. The record

contains ample evidence that supports the trial court's findings of fact.

The controlling legal principles are quite settled. A trust "is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, *which arises as a result of a manifestation of an intention to create it.*" (Emphasis added.) Restatement (Second) of Trusts § 2 (1959). In Illinois, creation of an express trust requires: (1) intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances which show that the settlor intended to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee. *Zukerman*, 218 Ill. App. 3d at 329; *In re Estate of Wilkening*, 109 Ill. App. 3d 934, 940-41 (1982); *Price v. State*, 79 Ill. App. 3d 143, 148 (1979).

"A charitable trust is a fiduciary relationship with respect to property *arising as a result of a manifestation of an intention to create it*, and subjecting the person by whom the property is held to equitable duties to deal with the property for a charitable purpose." (Emphasis added.) Restatement (Second) of Trusts § 348 (1959). Charitable trusts have similar characteristics as private trusts (Restatement (Second) of Trusts § 348, Comment *a* (1959)), and the methods of creating both types of trusts are the same (Restatement (Second) of Trusts § 349, Comment *a* (1959)). However, charitable trusts need not specify definite beneficiaries (Restatement (Second) of Trusts § 364, Comment *a* (1959)) and may be perpetual (Restatement (Second) of Trusts § 365, Comment *a* (1959)).

Each of the requisite elements of an express trust

must be established. If any one of the necessary elements is not described with certainty, no trust is created. *Wilkening*, 109 Ill. App. 3d at 941; accord *In re Frain*, 222 B.R. 835, 837 (Bankr. N.D. Ill. 1998) (applying Illinois law); *In re Marchiando*, 142 B.R. 246, 249-50 (N.D. Ill. 1992) (same). "Stated otherwise, any attempt to create an express trust that omits one or more of the formal requirements automatically fails." 76 Am. Jur. 2d *Trusts* § 46, at 74 (1992). The requirement that each of the necessary elements of an express trust be established has long been the law in Illinois. See, *e.g.*, *Tucker v. Countryman*, 414 Ill. 215, 221 (1953); *Marble v. Estate of Marble*, 304 Ill. 229, 235 (1922).

### A. *Trust Element of Intent*

The trial court found that Roosevelt did not intend to create an express charitable trust through the 1960 resolution, but rather intended to create the Council as its agent. As earlier emphasized, an express charitable trust arises, by definition, "as a result of a manifestation of an intention to create it." Restatement (Second) of Trusts §§ 2, 348 (1959). *"The intention of the settlor to presently create a declaration of trust is essential."* (Emphasis in original.) *Kavanaugh v. Estate of Dobrowolski*, 86 Ill. App. 3d 33, 39 (1980). Indeed, "the primary focus in determining the existence of a trust must be on the intent of the settlor to establish a trust at the time of the creation of the alleged trust ***." 76 Am. Jur. 2d *Trusts* § 64, at 92 (1992). It is not enough that the settlor secretly intends to create a trust. No trust will arise unless there is an outward expression of the settlor's intention at the time of the trust's purported creation. *Kavanaugh*, 86 Ill. App. 3d at 40; Restatement (Second) of Trusts § 4, Comment *a* (1959).

"It is immaterial whether or not the settlor knows that the intended relationship is called a trust, and whether or not [the settlor] knows the precise character-

istics of the relationship which is called a trust." Restatement (Second) of Trusts § 23, Comment *a* (1959). As a learned treatise explains:

> "In many cases the owner of property in disposing of it has no very clear idea of the precise nature of the disposition that [the owner] intends to make. The distinction between a trust and other juridical relationships is not always an easy one to draw, even for the trained lawyer. It is often difficult to tell whether the owner of property is creating a trust or making some other disposition. A trust is created if in substance what [the settlor] intends to create is the relationship that lawyers know as a trust. In most cases, and particularly where the intention is manifested in an instrument drawn by a competent lawyer, there is no difficulty in determining whether the owner of property has manifested an intention to create a trust." 1 W. Fratcher, Scott on Trusts § 23, at 249-50 (4th ed. 1987).

As otherwise stated: "There must be a particular intent to confer benefits through the medium of a trust, and not through some related or similar device." G. Bogert, Trusts & Trustees § 46, at 489-91 (rev. 2d ed. 1984).

The manifestation of intention to create a trust "may clearly appear from written or spoken words or may be determined by interpretation of the words or conduct of the settlor in the light of all the circumstances." Restatement (Second) of Trusts § 4, Comment *a* (1959). No particular form of words or conduct is necessary for the manifestation of intent to create a trust. Restatement (Second) of Trusts § 23, Comment *a* (1959). Indeed, "[a] trust may be created although the settlor does not use the word 'trust ***.' " Restatement (Second) of Trusts § 24, Comment *b* (1959). "Acts prior to and subsequent to, as well as acts contemporaneous with the manifestation which it is claimed creates a trust, may be relevant in determining the settlor's intention to create a trust." Restatement (Second) of Trusts § 24, Comment *b* (1959). "The question in each case is whether the settlor manifested an intention to create the kind of relation-

ship that to lawyers is known as a trust." 1 W. Fratcher, Scott on Trusts § 24, at 250 (4th ed. 1987); accord *Price*, 79 Ill. App. 3d at 148.

### 1. The Resolution Standing Alone

Plaintiffs claim that the 1960 resolution "comprehensively defined the relationship between Roosevelt and the Council." Plaintiffs contend that the 1960 resolution of the Roosevelt University board of trustees, by itself, manifests the University's intent to create a charitable trust, in which the Council acts as trustee over the right to restore and operate the Theatre for the benefit of the public. When a document makes clear the existence of a trust, no particular form of words is necessary. A court will support an intention to create a trust wherever such intention can be fairly collected from the language of the instrument. *Zukerman*, 218 Ill. App. 3d at 330. "In determining that intent the court must consider the plain and ordinary meaning of the words used [citations], and the intent must be ascertained by considering the entire document." *First National Bank of Chicago v. Canton Council of Campfire Girls, Inc.*, 85 Ill. 2d 507, 514 (1981).

Assuming, without deciding, that restoration and operation of the Theatre constitute possessory interests in real property that can be held in trust, it is clear that the 1960 resolution, standing alone, did not manifest an intent on the part of Roosevelt to create a charitable trust. We earlier quoted the resolution in its entirety. On its face, the resolution lacks many indicia that are consistent with charitable trusts.

Initially, the resolution does not contain any words of alienation or conveyance, *i.e.*, there are no words of *transfer* of an interest in the property from a "settlor" to someone or something that might be a "trustee." Plaintiffs point to certain "rights" that the resolution transferred to the Council. The resolution "authorized and directed" the Council to raise funds for the Theatre

restoration. The resolution made the Council "responsible" for supervising the restoration. The resolution also "empowered" the Council to hire a fund-raiser and staff and gave the Council "authority to supervise" the reconstruction while reporting to the Roosevelt University board of trustees. According to plaintiffs: "Virtually every paragraph of the Resolution grants broad discretion to the Council *as trustee.* *** Thus, the Resolution itself contains overwhelming evidence of Roosevelt's intent to authorize and empower the Council to act as fiduciary *for the public* and, in that capacity, to possess, restore and operate the Theatre, and hold and spend donations and Theatre revenues." (Emphasis added.)

Plaintiffs specifically discuss paragraph 12 of the 1960 resolution, which authorized the Council to retain any Theatre operating surplus in a development reserve. Plaintiffs describe paragraph 12 as expressing "Roosevelt's intent that the Theatre would be operated by the autonomous independent Council, using Theatre revenues to defray all expenses." According to plaintiffs, paragraph 12 gave the Council the "widest discretion to determine the adequacy of the development reserve, not only to assure the future of the Theatre for the public, but also to provide Roosevelt with additional protection from liability. Once an adequate reserve was established, Roosevelt would share in surpluses to support its academic mission." Indeed, plaintiffs go so far as to argue that Roosevelt, by paragraph 12 of the 1960 resolution, gave away its fundamental right of ownership of the Theatre. According to plaintiffs, paragraph 12 indicates the durable nature of the trust by providing that the Council "would continue to fulfill its mission" for an indefinite period of time by building a development reserve to fund the ongoing preservation of the Theatre.

It is clear that plaintiffs fail to distinguish the concepts of agency and trust. It must be remembered

that "[t]here are a number of widely varying relationships which more or less clearly resemble trusts, but which are not trusts, although the term 'trust' is sometimes used loosely to cover such relationships." Restatement (Second) of Trusts, ch. 1, topic 2, at 15 (1959). "An agency is not a trust." Restatement (Second) of Trusts § 8 (1959). An agent is one who undertakes to manage the affairs of another, on the authority and for the account of the latter, who is called the principal, and to render an account to the principal. See *Mills v. State National Bank*, 28 Ill. App. 3d 830, 834 (1975). Thus, when A puts his or her property in the hands of B to keep or manage, A creates, as between A and B, the relation known as principal and agent. *In re Estate of Morys*, 17 Ill. App. 3d 6, 9 (1973). An agent is subject to the control of the principal. Restatement (Second) of Trusts § 8, Comment *b* (1959); 76 Am. Jur. 2d *Trusts* § 13, at 45 (1992).

In this case, the resolution never uses the word "rights" in connection with the restoration and operation of the Theatre. Rather, the resolution delegated duties to the Council. The only time the resolution uses the word "rights" is when Roosevelt preserved and safeguarded its own property rights in the Theatre.

The intent to grant authority to take action with respect to real property is not the same as the intent to permanently alienate or transfer an ownership interest. See *Olson v. Etheridge*, 177 Ill. 2d 396, 406 (1997) (distinguishing an assignment of rights from a delegation of duties). Although the resolution makes the Council responsible for performing these duties, nothing in the resolution indicates an intent to alienate any alleged "rights" from Roosevelt. Rather, the delegation of duties to the Council created an agency relationship. For example, an apartment building owner directs her property manager to manage the building with discretion

to make decisions concerning building maintenance and finances. However, the delegation of these duties does not alienate the same rights from the owner, who can always step in and make decisions on her own relating to those matters. Also, the building owner retains the ultimate power to prevent the manager from taking any action with respect to her property or to discharge the manager altogether.

In this case, the resolution specifically directs that the Council act with "due regard for safeguarding the right, title and interest of the University in and to the Theatre." This is a clear expression of Roosevelt's intent to retain, rather than transfer, its property rights in and to the Theatre.

The 1960 resolution lacks other indicia that are consistent with charitable trusts. The resolution contains no words of delivery or any provision directing a delivery of property or an interest in property. The resolution states no "charitable" or "public" purpose, or any purpose to benefit anyone else. Also, the resolution does not state any purpose to confer benefits through the medium of a trust.

Further, the 1960 resolution contains a number of provisions that are inconsistent with the creation of a trust. The resolution states that the legal title to and all rights in the Theatre are to *remain* in Roosevelt, which precludes an alienation or transfer of such rights to a "trustee" as would be necessary for a trust. The resolution affirmatively states that it is intended to benefit its author, Roosevelt.

Also, the 1960 resolution contains many restrictions on the Council. Pursuant to the resolution, the Council was required to report periodically to the board regarding the restoration of the Theatre and to provide the board with requested information. The Council had to deposit all funds raised into a special, segregated University account. The Council could not enter into any

contracts, purchases, or obligations unless certain criteria were met, including having the money on hand to pay for the obligation. The Council's programming for the Theatre was required to be in harmony with the University's aims. The Council had to prepare an annual report for Roosevelt's board of trustees and submit to an annual audit. Also, all nominees for the Council's executive committee required approval of Roosevelt's board of trustees. These controls on the Council indicate an agency relationship.

The 1960 resolution, standing alone, cannot be read as a trust instrument. Every provision of the resolution is more consistent with the intent to create an agency relationship than the intent to create a trust, and the resolution lacks elements that are required to create a trust.

## 2. Parol Evidence

Plaintiffs additionally rely on parol evidence, *i.e.*, evidence outside of the resolution itself, to prove their claim of an express charitable trust. It is settled that an express trust may be established by parol evidence. However, one seeking to establish an express trust by parol evidence bears the burden of proving the trust by clear and convincing evidence. The acts or words relied upon must be so unequivocal and unmistakable as to lead to only one conclusion. If the parol evidence is doubtful or capable of reasonable explanation upon any other theory, it is not sufficient to establish an express trust. *Maley v. Burns*, 6 Ill. 2d 11, 18 (1955); *Cusack v. Cusack*, 339 Ill. 108, 120 (1930); *Zukerman*, 218 Ill. App. 3d at 330.

We note plaintiffs' contention that the clear-and-convincing burden of proof does not apply to their attempt to prove the existence of the express trust using parol evidence. Plaintiffs contend that the clear-and-convincing burden of proof applies only to attempts to

establish trusts with oral statements or other parol evidence, or attempts to modify written trusts through oral statements. According to plaintiffs, the express trust is based on the 1960 resolution, "as defined in part by the contemporaneous circumstances surrounding the Resolution's enactment and the later conduct of the parties."

We cannot accept this argument. This court explained long ago:

> " 'Where the trust does not appear on the face of the deed or other instrument of transfer, a resort to parol evidence is indispensable. It is settled by a complete unanimity of decision that such evidence must be clear, strong, unequivocal, [and] unmistakable ***.['] *** 'As a general rule, the policy of the law requires that everything which may affect the title to real estate shall be in writing,—that nothing shall be left to the frailty of human memory or as a temptation to perjury; and whenever this policy of the law has been broken in upon and parol evidence admitted, the courts have been ever careful to examine into every circumstance which may affect the probability of the alleged claim, as the lapse of time, the means of knowledge and circumstances of the witness; and it will not grant the relief sought where the claim has been allowed to lie dormant for an unreasonable length of time or where the evidence is not very clear in support of the alleged right ***'." *Keuper v. Unknown Heirs of Mette*, 239 Ill. 586, 592 (1909).

In this case, plaintiffs offer evidence outside of the purported trust instrument, *i.e.*, the 1960 resolution, as additional proof of their claim. Such evidence must be so clear and convincing as to lead to only one conclusion. See *Maley*, 6 Ill. 2d at 18.

Turning to the merits, plaintiffs contend that the trial court erroneously excluded certain parol evidence offered at trial and ignored other parol evidence admitted at trial. Plaintiffs presented parol evidence from several sources: (a) the official actions of Roosevelt, the purported settlor, through its board of trustees; (b) state-

ments by individual trustees and executives of Roosevelt and by others; and (c) statements made to the public. The evidence consisted of both exhibits and witness testimony.

The trial court considered that most of the parol evidence that plaintiffs presented "were not pertinent to the *legal intent* of the parties." (Emphasis in original.) The court concluded that "statements made by individuals are immaterial. The only one that could create an express trust was Roosevelt acting through its Board of Trustees. They never did so."

This narrow view of admissible evidence was erroneous. All of the circumstances are relevant in determining the settlor's intent to create an express trust. See *Price*, 79 Ill. App. 3d at 148; *LaThrop v. Bell Federal Savings & Loan Ass'n*, 42 Ill. App. 3d 183, 188 (1976), *aff'd*, 68 Ill. 2d 375 (1977); Restatement (Second) of Trusts § 24, Comment *b* (1959); 76 Am. Jur. 2d *Trusts* §§ 65, 66 (1992).

However, this evidentiary error does not compel reversal. It is the judgment of the trial court, and not what else may have been said by the trial court, that is on appeal to a court of review. *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983). In a nonjury case the whole record is before the reviewing court. Any error which may have been committed in ruling upon the admission or exclusion of evidence is unimportant. If there is competent evidence sufficient to sustain the trial court's decision it will be affirmed, regardless of the views of the trial court as to the competency of the evidence at trial. *Newman v. Youngblood*, 394 Ill. 617, 625 (1946).

In this case, the record contains ample evidence to support the trial court's conclusion that Roosevelt did not intend to create an express charitable trust through the resolution but, instead, intended to create the Council as an agent for restoring and operating the Theatre.

Plaintiffs posit that the official actions of Roosevelt show that the University intended to establish a charitable trust to protect the University's real estate tax exemption. We recounted at length the history that gave rise to and the debate that surrounded the resolution's adoption on February 18, 1960. The record includes: the rejection of the suggestion that a separate entity run the Theatre under its own "trusteeship"; the October 29, 1959, motion passed by Roosevelt's board of trustees requiring that under the ultimate arrangement Roosevelt not lose "ownership or control" of the Theatre; and the Trustees' direction on February 11, 1960, that the resolution be revised to comply with the conditions of the October 29, 1959, motion. Also surrounding the February 18, 1960, resolution was the "agreed understanding," based on trustee Gidwitz's statement that Roosevelt would exercise unlimited control over the Council and could change the terms of the resolution, including paragraph 12, at any time. These official actions of the Roosevelt University board of trustees clearly show that the University never intended to relinquish its ownership and control over the Theatre.

Also, subsequent official actions of Roosevelt demonstrated its intent to create an agency relationship through the 1960 resolution. The 1971 SOPs expressly "reaffirm[ed] and supplement[ed]" the 1960 resolution. The 1983 SOPs, expressly recounting the 1960 resolution, mandated that the Council operate the Theatre *for the benefit of Roosevelt.* The 1983 SOPs also recounted that the "sole purpose" of ATC Inc. was "to solicit funds" for the Theatre. Notably, in July 1995, Roosevelt's board of trustees dissolved the Council.

However, plaintiffs contend that Roosevelt expressed its intent to create a charitable trust in two documents approved by Roosevelt. The Council's 1962 bylaws and ATC Inc.'s 1981 bylaws each state that Roosevelt would

"take no unilateral action to terminate the availability" of the Theatre as long as the property was used for purposes consistent with the objectives set forth in the bylaws. In the Council's 1962 bylaws, Roosevelt additionally stated that it would not "sell the building without undertaking to provide for the continued functioning of the Council program."

This evidence is not clear and convincing. The above statements can be viewed consistently with an agency relationship. Accordingly, they are insufficient to establish an express charitable trust.

Plaintiffs next point to statements of individual Roosevelt officials made subsequently to the resolution's adoption on February 18, 1960, to prove that the University intended by that resolution to create an express charitable trust. However, these statements are outweighed by ample evidence. Statements from officials of Roosevelt, the Council, and ATC Inc. establish that, through the resolution, Roosevelt did not intend to create an express charitable trust but, rather, intended to create an agency relationship with the Council.

The IRS ruled in 1960 that contributions to the Council would be tax deductible because the Council was not a separate entity from Roosevelt. In 1993, ATC Inc. represented to the IRS, under penalty of perjury, that the Council had operated the Theatre as a "part" of or "unit within the University" since 1960 and that a "proposal" had been made to transfer Theatre operations to ATC Inc. prospectively. Thus, ATC Inc. admits that the Council never was an entity separate from Roosevelt.

In addition to the evidence already discussed, the record contains additional evidence against plaintiffs' claim of an express charitable trust. The trial court heard the testimony of Roosevelt University trustees Gidwitz, Stone, Mednick, Newman, Anixter, and Gross. The court summarized their testimony as follows:

"Six Roosevelt trustees testified in the case at bar. All agreed that during each's tenure on the Roosevelt Board, the University never placed the Theatre in trust nor did it take any action to divest itself of any control over the Theatre. These same individuals all testified that they never heard of a purported public trust until the onset of this litigation."

The trial court heard the testimony of these witnesses, observed their demeanor, and assessed their credibility. The court's findings based thereon are entitled to deference. See *Chicago Investment Corp.*, 107 Ill. 2d at 124.

Also, members of ATC Inc.'s executive committee testified at trial. They conceded that ATC Inc.'s offers to lease or buy the Theatre from Roosevelt were attempts by the corporation to gain the control over the Theatre that it lacked. They testified that such actions would have been "unnecessary and superfluous" if ATC Inc. actually had control of the Theatre. As John Blew, secretary of the Council and of ATC Inc., stated to University President Gross: "There is no question but that the University owns the Theatre and controls the Council—period."

Plaintiffs point to the following as evidence of trust intent. On April 5, 1960, Harland Allen, chairperson of Roosevelt's board of trustees, and Beatrice Sprachner, University trustee and Council chairperson, jointly issued a statement "for the purpose of clarifying any misunderstandings which may exist regarding plans for restoration and operation of the Auditorium Theatre." The "Seven-Point Statement" was printed in several Chicago newspapers the next day. It explained that the Council would "have full authority and responsibility for the restoration campaign and the operation of the theater" and would have "full authority and responsibility for the programs that go into the theater and for supervision of theater operations."

Plaintiffs point to additional statements by individual

Roosevelt trustees and executives. For example, on March 4, 1960, Allen announced in a press release:

"The University's trustees have been impressed by and are fully cognizant of the public trust which the ownership of the Theater has imposed upon them. *** By creating the Auditorium Theater Council *** the Board hopes to establish the reconstruction and operation of the Theater as a project from which the entire community will benefit and of which every citizen of the community can justly be proud."

In the April 1960 edition of "Progress," a Roosevelt publication, Dr. Edward Sparling, University president, reported in his column in pertinent part:

"Ever since Roosevelt University purchased the Auditorium building as its home in 1946 we have held the theater itself in trust for the people of Chicago.

\* \* \*

The recent action of the Board of Trustees, in granting permission to an independent civic group—the Auditorium Theater Council—to restore and operate the Auditorium Theater, frees Roosevelt University of the financial burden carried these years, and also frees it from any financial liability in regard to the restoration and operation of the theater. It makes available to the people of Chicago this added cultural and educational facility.

\* \* \*

The Auditorium Theater Council is taking a large burden from the University's shoulders, leaving all those dedicated to the academic program free to develop and expand the educational service to the community for which the University was founded and for which it lives."

Also, President Sparling wrote a letter to the Chicago Tribune, which was printed on April 6, 1960. He stated that the University "has held the theater in trust for the community."

Additionally, Spachner spoke at a 1961 fund-raiser. There, Spachner described to potential donors the goals of the Council and referred to the Theatre as a com-

munity treasure "held in trust." In a January 2, 1962, letter, Elmer Gertz, principal drafter of the resolution, referred to a "trust imposed upon the property."

These statements do not constitute unequivocal evidence that Roosevelt intended to create an express charitable trust though the 1960 resolution. None of these statements refer to the resolution creating a trust. To the contrary, most of these statements declare that *Roosevelt* held the Theatre "in trust" or was cognizant of the "public trust" that ownership of the Theatre involved. "A charitable trust is not created unless the settlor manifests an intention to impose enforceable duties. \*\*\* A charitable trust is not created if the settlor manifests an intention to impose merely a moral obligation." Restatement (Second) of Trusts § 351, Comment *c* (1959). Terms such as "held in trust" or "public trust" can be loosely made and could broadly refer to other relationships. See Restatement (Second) of Trusts, ch. 1, topic 2, at 15 (1959).

For example, Gertz's letter of January 2, 1962, states in pertinent part:

> "By resolution of its governing body, Roosevelt University *created an agency*, The Auditorium Theatre Council, and authorized this *agency* to raise funds to restore the Auditorium Theatre, to carry on the restoration out of the funds so raised, and to operate the Theatre when restored." (Emphases added.)

Gertz opined that pledges of funds had become enforceable promises and that Roosevelt was obligated to proceed with the restoration and subsequent operation of the Theatre. He further opined:

> "This obligation *on the part of the University* will continue so long as the Theatre continues to serve the purposes for which it was restored and without financial drain on the University. The University could not destroy the trust imposed upon the property by a sale of the Theatre to a private corporation or by demolition of the building." (Emphasis added.)

Again, this evidence speaks of a "trust" on the part of *Roosevelt*, not the Council. Indeed, the letter expressly states that the resolution created an agency relationship with the Council. This is consistent with Gertz's January 21, 1960, letter to Roosevelt's attorney, in which he stated: "It is the consensus of all involved in this situation that it is best not to form any separate *** trust or other legal entity, but to proceed in the matter set forth in the resolution."

We note that Gertz testified at trial. During his testimony, he referred to the resolution as constituting "a trust intended for the Auditorium Theatre." The trial court expressly weighed Gertz's statements that were contemporaneous with the resolution, assessed the credibility of his trial testimony, and assigned little weight thereto. This determination is particularly entitled to deference. See *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989).

This evidence could establish that Roosevelt created an agency relationship with the Council. Therefore, it is insufficient to establish an express charitable trust.

Plaintiffs also posit that statements made to the public show that the University intended to establish a charitable trust. Plaintiffs introduced various statements made in press releases, newspaper articles, fund-raising brochures, and a magazine published by a local savings and loan institution. This material generally discussed the degree of day-to-day autonomy the Council would have in restoring and operating the Theatre and how the Council would utilize donations to it. Plaintiffs called witnesses who testified that they relied on these communications in connection with fund-raising.

However, independence of spirit or conduct is not determinative of the Council's legal status as intended by Roosevelt through the resolution. Determinative of a principal-agent relationship is whether the principal has

*the right* to control the actions of the agent, not whether the principal *actually exercises* that right. *Darner v. Colby*, 375 Ill. 558, 560-61 (1941); See *Reith v. General Telephone Co. of Illinois*, 22 Ill. App. 3d 337, 339 (1974) (and cases cited therein).

In this case, Roosevelt gave the Council, as with many types of agents, broad day-to-day authority to conduct its responsibilities. However, the question is not the extent of the Council's day-to-day authority over the Theatre, but rather whether Roosevelt retained the right to exercise control if that ever became necessary. Overwhelming evidence proves that Roosevelt intended to and did retain the right to control the actions of the Council. For example, surrounding the 1960 resolution was the "agreed understanding," based on trustee Gidwitz's statement, that Roosevelt would exercise unlimited control over the Council and could change the terms of the resolution at any time. Further, the 1971 and 1983 SOPs mandated procedures the Council was to follow for the day-to-day operation of the Theatre and further secured Roosevelt's control over Theatre operations. The parties were aware that Roosevelt controlled both the Council and the Theatre. Indeed, Roosevelt exercised the ultimate control over the Council by dissolving it.

The circumstances giving rise to the 1960 resolution, the circumstances surrounding its adoption by Roosevelt's board of trustees, and the subsequent acts that show Roosevelt's intent in adopting the resolution amply and clearly support the findings of the trial court. As noted above, the appellate court in this case reversed and remanded for further proceedings based on what it perceived to be "legal and factual errors in the trial court's resolution of the charitable trust issue." 321 Ill. App. 3d at 771. However, the appellate court should have considered all of the facts and circumstances to determine if the trial court's findings were supported by sufficient

evidence. Had the appellate court done so, including any evidence erroneously excluded, it would have upheld the trial court's findings because they were based on more than sufficient evidence. As the appellate court dissent observed:

"[T]he evidence, including the exhibits the judge declined to consider, does not lead inexorably to the success of the plaintiffs' position. The test for the judge's factual determinations is whether they are supported by the manifest weight of the evidence. [Citation.] That is, after looking at all the admissible evidence, even, for purpose of argument, the newspaper clippings, can we say a conclusion opposite that of the trial judge is 'clearly evident'? [Citation.] If we cannot say that, we are engaging in impermissible second-guessing." 321 Ill. App. 3d at 786-87 (Wolfson, J., dissenting).

We agree.

The trial court was presented with a considerable amount of evidence, including witness testimony. Ruling against plaintiffs, the court found that Roosevelt, by the 1960 resolution, did not intend to create an express charitable trust, with the Council as trustee for the benefit of the public. Rather, the trial court found that Roosevelt created the Council to act as Roosevelt's agent.

It is true that the record contains *some* evidence that supports plaintiffs' claim. However, the record contains ample evidence to support the trial court's findings. It must be remembered that it was the trial court who saw the witnesses and heard them testify. "It is axiomatic that a reviewing court may not reweigh the evidence or substitute its judgment for that of the trier of fact. Findings of fact are entitled to deference, and this is particularly true of credibility determinations." *Zaderaka*, 131 Ill. 2d at 180; accord *Chicago Investment Corp.*, 107 Ill. 2d at 129. This court has long observed:

" 'Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to

observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion.' " *Greene v. City of Chicago*, 73 Ill. 2d 100, 110 (1978), quoting *Schulenburg v. Signatrol Inc.*, 37 Ill. 2d 352, 356 (1967).

Regardless of which particular pieces of evidence the trial court may have cited in its decision, the court's findings were supported by evidence. Given the entire record on appeal, we cannot say that the trial court's factual findings were against the manifest weight of the evidence.

In this appeal, the controlling issue is whether Roosevelt intended to create an express charitable trust. The trial court's finding, supported by ample evidence, that Roosevelt did not so intend controls the disposition of the remaining issues.

B. *Remaining Trust Elements*

Two additional requirements of an express trust are: the existence of a definite subject matter or trust property, sometimes referred to as the corpus of the trust, and delivery of the trust corpus to the trustee. *Zukerman*, 218 Ill. App. 3d at 329.

In this case, the trial court determined: ''[T]he Theatre cannot be the corpus of the trust because Roosevelt has held title in the Theatre since it purchased it in the 1940's and has safeguarded its right, title, and interest since that time." The court ruled that as a matter of law, a trust corpus was limited to tangible property and interests in real property and other intangibles could not be held in trust. Thus, the trial court concluded that the right to restore and operate the Theatre could not constitute the trust corpus.

Further, the trial court found that the alleged trust failed for lack of delivery of the trust corpus. According

to the court, plaintiffs failed to show that Roosevelt had ever relinquished its right, title and interest in the Theatre. The trial court also found that its determination that there was no charitable trust obviated the need to consider the remaining requirements of an express trust.

The appellate court assigned error to the trial court's legal conclusion that the right to restore and operate the Theatre could not be the corpus of an express charitable trust. 321 Ill. App. 3d at 776-78. The appellate court noted that, "[i]n rejecting the fact that the right to operate, restore and maintain the Theatre could constitute the corpus of the trust, the court incorrectly analyzed the issue of delivery of the trust corpus." 321 Ill. App. 3d at 778. The appellate court also assigned error to the trial court's failure to consider the remaining trust elements. "With that approach the trial court failed to consider a variety of circumstances that indicate trust intent contrary to the recognized principle of law that proof of intent may be demonstrated by surrounding circumstances." 321 Ill. App. 3d at 779. The appellate court held that, based on these perceived errors, the trial court's conclusion that there was no express trust was clearly erroneous. 321 Ill. App. 3d at 779.

We disagree. The appellate court dissent correctly reasoned:

"I do not agree the trial judge's finding of a lack of intent to create a trust rests on his apparently mistaken view that intangible rights cannot be the corpus of a trust. The judge's first finding that there was no such intent had nothing to do with the corpus issue.

* * *

Lack of a permissible corpus was a second, alternative reason offered by the trial judge. It is not the *sine qua non* of his decision." 321 Ill. App. 3d at 787 (Wolfson, J., dissenting).

The record supports this position.

The trial court expressly found: "One thing was abundantly clear at the time of the passing of the 1960 Resolution—The Board of Trustees of Roosevelt was not going to create *anything* that would diminish their interest in or power over the Theatre." (Emphasis added.) Thus, the trial court expressly determined that Roosevelt did not intend to create a *trust of any sort*, regardless of what the corpus might be, how that corpus would be delivered, and whether the remaining trust elements were present. "In any event, we need not accept the trial court's legal conclusion, as long as its factual determinations are supported by the record. As stated above, the relevant findings were amply supported in this case. Thus, there is no basis for any finding of error." *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 282 (1999).

The trial court found that Roosevelt did not intend to create a trust of any sort. This finding, supported by ample evidence, compels the conclusion that no trust was created, and obviates consideration of the remaining trust elements. See, *e.g.*, *Wilkening*, 109 Ill. App. 3d at 941-42.

### III. Remaining Issues

#### A. *Agency*

The appellate court assigned error to the trial court's finding that Roosevelt, through the 1960 resolution, intended to create an agency relationship with the Council. The appellate court concluded: "For the reasons previously discussed, we cannot say the factual and legal errors which formed the basis of the [trial] court's analysis regarding the trust issue did not erroneously cause the court to find [an] agency relationship." 321 Ill. App. 3d at 780. However, for the reasons earlier stated in this opinion, we conclude that the trial court's finding of agency, amply supported by the evidence, must be upheld. See *Zych*, 186 Ill. 2d at 282.

## B. *Plaintiffs' Alternative Contentions*

Since the appellate court reversed the trial court and remanded on the express charitable trust claim, the appellate court expressly declined to address plaintiffs' alternative claims of relief. 321 Ill. App. 3d at 780-81. Plaintiffs assert them here; none are meritorious.

Plaintiffs contend that we should declare a constructive trust over ATC Inc.'s funds, to ensure that representations to the donating public are carried out and donations are not diverted. A constructive trust is one raised by operation of law as distinguished from an express trust. *Suttles v. Vogel*, 126 Ill. 2d 186, 193 (1988). A constructive trust is an equitable remedy that may be imposed to redress unjust enrichment caused by a party's wrongful conduct. *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 114 Ill. 2d 278, 293 (1986). The proceeds of the alleged wrongful conduct must exist as an identifiable fund traceable to that conduct, such that it can become the *res* of the proposed trust. *People ex rel. Nelson v. Bates*, 351 Ill. 439, 443 (1933); *Moore v. Taylor*, 251 Ill. 468, 472-73 (1911).

In this case, the funds at issue are donations not from the public but rather from Theatre operating revenues. As the trial court found:

"It is also clear to this Court that [defendants] have never *** assumed control over any public contributions to the Theatre, never interfered with any of the [appurtenances] of the Theatre, nor jeopardized the Theatre continuing as a cultural center for the public's benefit. Significantly, there has been no injustice nor injury to the public as their monies, gifted upon the Theatre, were expended, for that purpose and that purpose only.

* * *

The only thing that cannot be done is spend donations given to the Theatre, by the public, for anything but the Theatre. However, this is not an issue in this case. There is no evidence that Roosevelt ever attempted to do that. No

one has ever said that in this lawsuit. They may have said it to the media, but never in this suit."

Moreover, the trial court ordered that all donations to the Theatre must be accounted for and restricted to Theatre use. We agree with the appellate court dissent (321 Ill. App. 3d at 788 (Wolfson, J., dissenting)) that there is no evidence of an identifiable fund traceable to any wrongful conduct in this case. See *In re Estate of Franke*, 124 Ill. App. 2d 24, 33-34 (1970). Accordingly, this claim fails.

We consider plaintiffs' next three claims collectively. Plaintiffs claim an express bilateral contract. Plaintiffs contend that the 1960 resolution and the seven-point statement constituted a contract between Roosevelt and the Council, and ATC Inc. as successor, which was later amended by the 1971 and 1983 SOPs.

Plaintiffs claim that Roosevelt is equitably estopped to deny the authority of ATC Inc. to operate the Theatre. Plaintiffs contend that although Roosevelt purportedly reserved the right to terminate any allegedly unauthorized conduct by ATC Inc., Roosevelt never took any action. According to plaintiffs, ATC Inc. relied upon Roosevelt's inaction and the University is now estopped from denying ATC Inc.'s "continuing right to operate the Theatre."

Plaintiffs also claim a license by estoppel. They contend that Roosevelt granted the Council, and now ATC Inc., a license to restore and operate the Theatre and that Roosevelt is estopped from revoking the license.

For plaintiffs to prevail on any of these theories of entitlement to control over the Theatre, they must prove that the Council was granted and held rights or interests in the Theatre greater than that retained by Roosevelt, which were then legitimately transferred to ATC Inc., and that those rights were not revocable. Without these legal and factual prerequisites, plaintiffs' claims cannot succeed.

Plaintiffs contend that the Council and ATC Inc. became "fused." Plaintiffs argue that the role of ATC Inc. gradually expanded subsequently to its creation and eventually "took over the rights and duties of the unincorporated Council" as its "successor." Plaintiffs rely on ATC Inc.'s bylaws as empowering it to operate the Theatre. The bylaws state that ATC Inc.'s purposes are, *inter alia*, "[t]o restore[,] modernize and operate the Auditorium Theatre." As additional proof, plaintiffs point to contracts that ATC Inc. entered into with vendors and others in its own name.

We cannot accept this contention. All of plaintiffs' claims of control fail because neither Roosevelt nor the Council ever granted to ATC Inc. the right to restore and operate the Theatre.

The trial court found as follows. Although Roosevelt and ATC Inc. were in negotiations regarding their relationship to the Theatre, by the time the present lawsuit was filed, no transfer of rights to or control of the Theatre had been accomplished. The trial court found that ATC Inc. was solely a fund-raising arm, initially of the Council, and now of the AT of RU. The court further found:

> "[Plaintiffs] ask this court to assert that ATC, Inc. has ownership rights to all the funds and assets in the Theatre. They maintain that [the Council] and ATC, Inc. were blended together and that they became one and they now own the funds and the assets of the Theatre. It is true the groups usually had the same membership. However, these groups had different minutes, reported to the IRS in different ways, were established for different purposes and were treated differently by the trustees of Roosevelt. Even most of the group opposing Roosevelt, when called upon to testify, indicated that they recognized and reported the differences between the [Council] and ATC, Inc. The overwhelming amount of evidence clearly showed that the groups never merged. ATC, Inc. never had any right to governance. All they could do is raise money for the

restoration of the Theatre. They never had any rights to the funds. After reviewing the documents, after hearing the testimony, after examining ever[y] piece of evidence, the Court finds that all these counts fail. ATC, Inc. has no ownership rights, there is no equitable or promissory estoppel and the transfer of funds to Roosevelt, from [the Council] and ATC, Inc. is proper."

Ample evidence supports the trial court's findings.

We earlier recounted the circumstances surrounding the creation of ATC Inc. and its relationship with Roosevelt and to the Theatre. This evidence includes the following. By its resolution, Roosevelt's board of trustees expressly authorized the incorporation of ATC Inc. "for fund raising purposes only." This sole purpose of ATC Inc. is reflected in its articles of incorporation. The 1983 SOPs distinguished the identity and function of the Council from those of ATC Inc. and expressly stated that the sole purpose of ATC Inc. was to solicit funds for the Theatre.

This evidence includes ATC Inc.'s own actions. In 1993, ATC Inc. represented to the IRS that the Council operated the Theatre as a unit of Roosevelt and that ATC Inc. did not operate the Theatre. Indeed, in their trial testimony, members of ATC Inc. admitted that ATC Inc.'s negotiations with Roosevelt to purchase or lease the Theatre from Roosevelt: (1) were attempts to gain the control over the Theatre that it lacked; and (2) would have been "unnecessary and superfluous" had ATC Inc. actually had control over the Theatre. Indeed, as John Blew, ATC Inc. and Council secretary acknowledged to Roosevelt: "There is no question but that the University owns the Theatre and controls the Council—period."

Also, the trial court found that the language in ATC Inc.'s bylaws, which purportedly allows ATC Inc. to do more than raise funds, was "inconsistent with all the other evidence presented." The court found that ATC Inc.'s articles of incorporation limited its corporate

purpose to fund-raising. Any action by ATC Inc. to operate the Theatre was *ultra vires*. Ample evidence supported this finding. All of plaintiffs' alternative claims were based on the erroneous factual premise that ATC Inc. legitimately operated the Theatre. More than sufficient evidence supports the trial court's rejection of this premise.

The trial court's findings are not against the manifest weight of the evidence. See *Leonardi*, 168 Ill. 2d at 106. We find no basis to disturb the trial court's rejection of these claims. See *Zych*, 186 Ill. 2d at 282.

In response to these findings, ATC Inc. invokes this court's equitable power. "Courts of equity possess original and inherent power to recognize, execute and control trusts and trust funds." *Village of Hinsdale v. Chicago City Missionary Society*, 375 Ill. 220, 233 (1940). Equity considers the general charitable purpose of a settlor as the substance of the gift and the mode indicated in the trust document for effectuating this purpose as a mere incident of the gift. *First National Bank of Chicago v. Elliott*, 406 Ill. 44, 55-56 (1950); *Missionary Society*, 375 Ill. at 233.

Where a literal execution of a charity becomes impossible, impracticable, or inexpedient, and the settlor has manifested a general intent to create a charitable trust, a court, in the exercise of its ordinary equity powers, will not allow the trust to fail. Rather, the court will execute the trust *cy pres*, *i.e.*, as near as the court can according to the trust's original purpose. *Missionary Society*, 375 Ill. at 233; *Kemmerer v. Kemmerer*, 233 Ill. 327, 338-39 (1908); accord Restatement (Second) of Trusts § 399 (1959). When a definite charitable trust is created, the failure of the particular mode in which it is to be effectuated does not destroy the charity; equity will substitute some other mode so that the substantial intent of the settlor shall not depend on the insufficiency of the formal

expression of the trust document. *Webb v. Webb*, 340 Ill. 407, 420 (1930). Accordingly, a court of equity has the power to substitute one trustee in place of another for the purpose of administering a charitable trust. See *Mason v. Bloomington Library Ass'n*, 237 Ill. 442, 449 (1908).

These principles make clear, as ATC Inc. concedes, that this court's exercise of its equitable power in this regard is linked to Roosevelt's trust intent. However, as we previously discussed, the trial court found that Roosevelt did not intend to create a trust of any sort, which finding is supported by ample evidence. Since Roosevelt did not intend, by the 1960 resolution, to create a charitable trust, then there is no charitable trust intent for this court to effectuate.

As an alternative request for cross-relief, plaintiffs ask that we reassign this case to a new trial judge on remand. Supreme Court Rule 366(a)(5) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require. 155 Ill. 2d R. 366(a)(5). This authority includes the power to reassign a matter to a new judge on remand. See, *e.g.*, *In re Marriage of Smoller*, 218 Ill. App. 3d 340, 346-47 (1991); *People v. Austin*, 116 Ill. App. 3d 95, 101 (1983). Plaintiffs refer to four circumstances that allegedly call into question the trial court's impartiality. The trial court allegedly ignored principles of trust law and excluded relevant evidence. Also, in the course of ruling on Roosevelt's counterclaim, specifically the breach of fiduciary count against Eychaner and Weiss, the trial court commented on plaintiff Eychaner's motive for bringing this litigation. The court found that Eychaner was liable and that Weiss was not. Lastly, subsequently to its decision, the trial court held the Council's executive director in direct criminal contempt, a ruling which the appellate court reversed.

We decline plaintiffs' request. A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice. See *In re Marriage of Petersen*, 319 Ill. App. 3d 325, 339 (2001); *In re Marriage of Hartian*, 222 Ill. App. 3d 566, 569 (1991). "To conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made." *People v. Vance*, 76 Ill. 2d 171, 179 (1979).

A judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality. *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 490-91, 114 S. Ct. 1147, 1157 (1994). Allegedly erroneous findings and rulings by the trial court are insufficient reasons to believe that the court has a personal bias for or against a litigant. *Hartian*, 222 Ill. App. 3d at 569. Also, it is clear that ordinarily the fact that a judge has ruled adversely to a party in either a civil or criminal case does not disqualify that judge from sitting in subsequent civil or criminal cases in which the same person is a party. *Vance*, 76 Ill. 2d at 178; see *Nehring v. First National Bank in DeKalb*, 143 Ill. App. 3d 791, 805 (1986).

Rather, the party making the charge of prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias. *Petersen*, 319 Ill. App. 3d at 339; *Hartian*, 222 Ill. App. 3d at 569. This personal bias can stem from an extrajudicial source. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 16 L. Ed. 2d 778, 793, 86 S. Ct. 1698, 1710 (1966); *Petersen*, 319 Ill. App. 3d at 339; *Hartian*, 222 Ill. App. 3d at 569.

In this case, plaintiffs do not offer any evidence of judicial bias or prejudice stemming from an outside source. Rather, plaintiffs base their claim on the trial itself. Judicial bias or prejudice can also stem from the facts adduced or the events occurring at trial. *Liteky*, 510

U.S. at 551, 127 L. Ed. 2d at 488, 114 S. Ct. at 1155. In this regard, the United States Supreme Court has explained:

> "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphases in original.) *Liteky*, 510 U.S. at 555, 127 L. Ed. 2d at 491, 114 S. Ct. at 1157.

Accord *Petersen*, 319 Ill. App. 3d at 340; *People v. Damnitz*, 269 Ill. App. 3d 51, 57 (1994).

The four circumstances to which plaintiffs refer as evidence of judicial bias do not display such deep-seated favoritism or antagonism that would make fair judgment impossible. Rather, the circumstances arise in the context of allegedly erroneous findings and rulings, which are insufficient to show judicial bias against plaintiffs. Further, the trial court expressly based its remarks regarding Eychaner on his credibility as a witness, "which is clearly within the purview of the trial court." *McCormick v. McCormick*, 180 Ill. App. 3d 184, 194 (1988). Accordingly, we decline plaintiffs' request to reassign this case to another judge on remand.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court, which reversed the order of the circuit court of Cook County, is reversed, and the cause is remanded

282

to the trial court for further proceedings consistent with this opinion.

*Appellate court judgment reversed;*
*circuit court judgment affirmed;*
*cause remanded.*

JUSTICE RARICK took no part in the consideration or decision of this case.