NOTICE
Decision filed 05/18/22. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2022 IL App (5th) 210250

NOS. 5-21-0250, 5-21-0251 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | Nos. 21-CC-1, 21-CC-2 |
| | ) | |
| JOHNSON & JOHNSON and | ) | |
| SUSAN NICHOLSON, M.D., | ) | Honorable |
| | ) | Christopher T. Kolker, |
| Defendants-Appellants. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Welch and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendants, Dr. Susan Nicholson and Johnson & Johnson (J&J), appeal the St. Clair County court's judgment holding them in direct criminal contempt. Specifically, the defendants contend, *inter alia*, that the trial court erred in holding the defendants in direct criminal contempt when it was necessary to consider extrinsic evidence to reach a factual conclusion as to whether Dr. Nicholson's absence was the result of willful misconduct. The defendants further request that on remand the trial judge be substituted because his interactions with the defendants during the trial demonstrated his partiality in this matter. For the following reasons, we reverse the trial court's direct contempt finding against the defendants and deny the defendants' request for substitution of judge.

1

¶ 2                                I. BACKGROUND

¶ 3     On July 12, 2021, a trial commenced in the matter of Cadagin v. Johnson & Johnson, No. 18-L-572 (Cir. Ct. St. Clair County), a product liability action involving talcum powder, in St. Clair County. As a part of its case-in-chief, J&J called Dr. Nicholson as a witness to testify. Dr. Nicholson serves as vice president and head of women's health at J&J and testified on behalf of the company "on issues of talc[um powder] safety."

¶ 4     Dr. Nicholson was called by J&J as its first witness on Friday, July 23, 2021. Dr. Nicholson testified that she initially planned "to testify remotely by video" because she had "not been traveling due to the pandemic and some individuals in [her] personal circle who are sensitive medically." However, she testified that she decided to come testify in person even though she "wasn't thrilled about going to a crowded airport and potentially that exposure." Dr. Nicholson indicated that "it can be a little bit challenging to have somebody not present" and explained that she came to the courtroom "because this is obviously a very important issue." Then Dr. Nicholson went on to testify regarding matters related to the civil lawsuit that are not relevant to this appeal.

¶ 5     Following J&J's direct examination of Dr. Nicholson, the court recessed for lunch. During that break, the judge asked the plaintiff's counsel how long they expected their cross-examination would take. The plaintiff's counsel indicated that the cross-examination would take the remainder of the afternoon and possibly go into the following Monday. The trial court then indicated it planned to recess the trial at 3:30 p.m. that afternoon. Following the break, defense counsel informed the trial court and opposing counsel that "Dr. Nicholson is happy to stay here for as long as it takes today to finish her testimony, but due to personal conflicts she is not able to be here next week." The trial court responded that "[Dr. Nicholson] better change those" plans and further stated that "I would assume [Dr. Nicholson] would know. You know, when an expert witness goes

2

on a Friday[,] I mean the assumption would be you better be prepared for them to be here on Monday." Defense counsel again reiterated, "she is willing and able to stay as long as needed tonight. She cannot come back next week, Your Honor." The trial court, after further discussion with defense counsel, then asked that Dr. Nicholson be brought into the courtroom where it indicated the issue and stated "As you know this trial is lengthy. And we need you back next week. And there's a couple ways we can do that. Some of them are not desirable. I don't want to put you up in county housing and force you to stay here. I want you to come back or be here on Monday on your own." Then the judge asked Dr. Nicholson to explain the "personal commitments" she had that following Monday, and asked whether they could be changed "so you're here on Monday?" Dr. Nicholson replied, "No, judge," and explained that she did not want to reveal her commitment with a "room full of people present." The trial judge inquired as to whether Dr. Nicholson could appear any day the following week, "Tuesday?" After a moment of hesitation, Dr. Nicholson responded, "I can be here on Thursday." However, when asked, the plaintiff's counsel objected because he "thought we were going to be done by then" and also due to concerns "that defense is trying to jam us up because we're supposed to start another trial." After further discussion between counsel, wherein plaintiff's counsel indicated they had not been informed that Dr. Nicholson had a conflict prior to that day, the trial judge asked Dr. Nicholson if she would be willing to whisper her personal commitment to him in his ear. Dr. Nicholson did so, but the record does not reflect her exact words. However, following the interaction, the trial court stated, "I think we have resolved the issue. And Dr. Nicholson will be here on Monday morning." Shortly before ending for the day, defense counsel again requested the trial court allow them to continue and finish the testimony of the witness or the trial court allow Dr. Nicholson to complete her testimony remotely via video. The trial court denied both requests.

3

¶ 6    At the start of the trial on Monday, the trial court noted that Dr. Nicholson was absent from the courtroom. He asked defense counsel whether Dr. Nicholson could be available the next day, Tuesday. The defense counsel responded, "I'm not sure. And if I could give the Court additional information in-camera." The trial court then asked her to "Hold on a second," and stated on the record his recollection of what Dr. Nicholson had said. At first, Dr. Nicholson "refused" to tell the court why she could not appear. After some discussion, Dr. Nicholson whispered to the court "that she had a friend or someone close to her that I'm going to infer has cancer, and she thought this— she wanted to spend some time with this person. Of course, that would imply that this person's time is limited." The trial court then stated several things it found odd or strange about Dr. Nicholson's and J&J's behavior when addressing the "personal commitment" issue during the proceedings on Friday. Specifically, the trial court "wondered why a defendant would put her [Nicholson] on the stand on Friday." The trial court was also perplexed about Dr. Nicholson's hesitancy to indicate she had a friend with cancer because defense counsel had inquired of the entire venireman as to whether people close to them had cancer. In fact, the trial judge stated that he had told Dr. Nicholson that she could "just come back on Sunday night and we'll [parties] get you out of here Monday morning." The trial court also stated that during his conversations with Dr. Nicholson on Friday that he did not believe her, "She was caught off guard when I asked her. And she did not seem ready to answer the question, and wasn't credible."

¶ 7    The trial court then noted that at 10 p.m. the night prior, it received an e-mail from defense counsel informing it that Dr. Nicholson would not appear because of a medical condition that developed over the weekend. Defense counsel then informed the trial court that Dr. Nicholson was not in Virginia visiting her sick friend as discussed on Friday but instead was "on her way to her medical provider to seek treatment." Defense counsel requested to provide the trial court with

4

"additional details of Dr. Nicholson's condition and what has transpired since she was last here, *in-camera*" due to the sensitive nature of the medical issues. Opposing counsel objected to that request stating, "We'd like it on the record. I mean, it can be at the bench, you know, but we'd like it on the record." They further explained, "this situation with Dr. Nicholson appearing Friday, and then having something Friday afternoon and needing to get off the stand. This is not the first time. It happened in the Ingham case. *** we believe it's happened in other cases." The trial court indicated its intention to deny the submissions offered on behalf of Dr. Nicholson. Defense counsel again asked that her disclosure of Dr. Nicholson's medical issues be issued under seal because she would have to disclose Dr. Nicholson's "personal physical and mental health that explains *** why it is that she cannot be here today." Defense counsel further stated to the trial court that they had worked with Dr. Nicholson to secure arrangements from Virginia, where she planned to visit her sick friend, to St. Louis so that she could be at the trial on Monday, including chartering her a private flight. Defense counsel attested that they were not even aware that Dr. Nicholson had cancelled her trip to see her friend until Sunday evening when Dr. Nicholson notified them that her health had declined over the weekend, and she would be seeking medical treatment.

¶ 8     Defense counsel again requested the trial court allow them to submit an affidavit or documentation as to Dr. Nicholson's condition, how it deteriorated over the weekend, and to the medical care she was receiving at that time. The trial court ultimately granted the request as to the filing of an affidavit but was skeptical about the excuse offered by J&J as to why Dr. Nicholson had not appeared. From the trial court's perspective, it appeared that Dr. Nicholson "was going to try and avoid being here on Monday." The trial judge indicated, "she said several times to me that she wouldn't be here." Nevertheless, the trial court indicated that defense counsel could submit information related to Dr. Nicholson under seal. The trial court also made a pronouncement finding

5

both J&J and Dr. Nicholson in contempt and gave an instruction to the jury that "Dr. Nicholson has refused to appear for cross examination. \*\*\* [A]t this moment in time, her testimony on direct and the earlier—is stricken. And you are to not consider it, and wipe it out as if it never happened." The next morning, the trial court struck the affidavit filed by defense counsel as being inadmissible hearsay.

¶ 9 On July 28, 2021, the trial court issued written contempt orders against Dr. Nicholson and J&J formally adjudging both to be in "direct criminal contempt of court" and sentenced each to a $500 fine. While the orders were essentially the same, the order directed at J&J found that "[t]he conduct of [Dr.] Nicholson is imputed to [J&J], as she is their agent." The trial court's orders found that "the conduct of [Dr. Nicholson], which occurred in the presence of this Court while court was in open session," *inter alia*, "impeded and interrupted" proceedings, and such conduct included "lying to the court about the reasons that [Dr.] Nicholson allegedly could not appear \*\*\* and lying that she would be in court on July 26, 2021," and that "the conduct of [Dr.] Nicholson not being in court was observed by the Court and is direct criminal contempt of court."

¶ 10 The trial court also issued supplemental orders on July 30, 2021, commenting on the defendants' statement of allocution that had been previously filed. In the order, the trial court noted that the allocution reiterated arguments that the court "found to lack credibility," including that Dr. Nicholson's body language on Friday undermined her credibility. The court found her fears of COVID-19 to be not credible, especially because the allocution admitted J&J had secured private flights for Dr. Nicholson's travel to the trial both Friday and Monday, which alleviated the fears of contracting COVID-19 in "crowded airports."

¶ 11 Dr. Nicholson and J&J subsequently filed timely appeals, and the appeals were consolidated on November 5, 2021, before this court.

¶ 13    The central issue raised before us is whether the trial court properly found Dr. Nicholson and J&J in direct criminal contempt for Dr. Nicholson's failure to reappear and finish her testimony at the trial.

"This court has defined criminal contempt of court 'as conduct which is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute.' [Citations.] Further, the court has recognized two forms of criminal contempt: direct and indirect.

Direct criminal contempt is contemptuous conduct occurring 'in the very presence of the judge, making all of the elements of the offense matters within his own personal knowledge.' [Citation.] Direct contempt is 'strictly restricted to acts and facts seen and known by the court, and no matter resting upon opinions, conclusions, presumptions or inferences should be considered.' [Citation.]

Indirect criminal contempt is contemptuous conduct 'which in whole or in an essential part occurred out of the presence of the court, is not admitted, and which is therefore dependent for its proof upon evidence of some kind. [Citation.] Where the judge does not have *full personal knowledge of every element of the contempt and its demonstration depends on the proof of facts, of which the court would have no judicial notice, the contempt is held to be indirect.*' (Emphasis added.) [Citation.]

Direct criminal contempt may be found and punished summarily because all elements are before the court and, therefore, come within its own immediate

knowledge. Consequently, the usual safeguards of procedural due process are not required. [Citations.] On the other hand, because a finding of indirect contempt requires proof of matters outside the immediate knowledge of the court, the alleged contemnor is entitled to due process safeguards, including notice, opportunity to answer, and a hearing." (Emphasis in original.) *People v. L.A.S.*, 111 Ill. 2d 539, 543-44 (1986).

¶ 14 Further, "[b]efore citing an individual with criminal contempt, the court must find that the contemptuous conduct was willful." *In re Carrington H.*, 357 Ill. App. 3d 1039, 1041 (2005). "[A] finding of direct criminal contempt cannot rest upon mere opinion or the presumptions of the trial court." *People v. Coulter*, 228 Ill. App. 3d 1014, 1023 (1992).

¶ 15 Here, the trial court was faced with the absence of Dr. Nicholson on Monday morning after Dr. Nicholson agreed to be present to finish her testimony. The trial court's contempt orders found that "the conduct of Nicholson not being in court was observed by the Court and is direct criminal contempt of court." This is incorrect. Our supreme court has held that "absence, standing alone, [is] insufficient to establish that [a person] wilfully intended to disrupt the proceedings and embarrass the court." *L.A.S.*, 111 Ill. 2d at 544-45 ("The fact of the minor's *absence* was immediately before the court, but the *reasons* for her absence were not," thus the trial court erred in finding direct contempt because "[t]he requisite element of wilfulness" for the absence could only have been "established by facts beyond the court's knowledge." (Emphases added.)).

¶ 16 The reason that absence alone has been held to be insufficient for a finding of direct contempt is because with mere absence, the trial court has no way of knowing why the individual was not present and whether his or her absence was willful. See *People v. City of East St. Louis*, 206 Ill. App. 3d 626, 638 (1990) (individual's absence alone was insufficient for direct contempt

because "[t]he circuit court had no way of knowing why [the individual] was not present"). In order for the trial court to be able to determine if the individual's absence is contemptuous the court must ascertain whether the individual is willfully absent from court by "taking evidence as to facts and circumstance not immediately before" the court and relying on facts outside the trial court's personal knowledge. *L.A.S.*, 111 Ill. 2d at 545. Generally, "[a]n alleged contemnor cannot be held in contempt when he is unable to comply through no fault of his own." *East St. Louis*, 206 Ill. App. 3d at 638.

¶ 17    In this matter, where Dr. Nicholson and J&J claimed that Dr. Nicholson could not attend the trial because of a medical condition, the trial court's determination that Dr. Nicholson and J&J should be held in contempt was dependent upon the trial court considering the truth of whether or not Nicholson was, in fact, ill and unable to attend the trial. The trial court only had before it the evidence of Dr. Nicholson's absence, coupled with statements from J&J's counsel that Dr. Nicholson was medically ill. For the trial court to have found Dr. Nicholson and J&J in contempt (*i.e.*, determine that Dr. Nicholson was not ill and was lying), it would have had to rely upon proof of matters outside of the court's immediate knowledge. This type of contempt would be indirect, not direct.

¶ 18    A mischaracterization of the type of contempt by a trial court does not always require reversal. *Id.* at 639. However, here, where the trial court not only mischaracterized the type of contempt but also failed to offer the due process procedural safeguards required for a finding of indirect contempt, "including notice, opportunity to answer, and a hearing," reversal is required. *L.A.S.*, 111 Ill. 2d at 543-44; *East St. Louis*, 206 Ill. App. 3d at 639.

¶ 19    J&J's counsel requested that the trial court allow them the opportunity to present evidence regarding Dr. Nicholson's medical illness, her reasons for not being present, and J&J's efforts to

secure her presence for the trial. J&J's counsel submitted an affidavit that the trial court struck as inadmissible hearsay. J&J's counsel offered to submit an affidavit from Dr. Nicholson and Dr. Nicholson's physician, offered to have Dr. Nicholson testify virtually, and offered to have a psychiatrist testify live as to Dr. Nicholson's condition and illness. However, the trial court declined to accept any of the evidence J&J's counsel offered. The trial court's refusal of this evidence deprived both Dr. Nicholson and J&J of the due process required for a finding of indirect contempt. Therefore, we cannot construe the trial court's finding of direct contempt as a finding of indirect contempt because due process was not afforded.

¶ 20    We briefly note the contention of the State that the trial court could make the determination that Dr. Nicholson was "lying to [it] about the reasons that Nicholson allegedly could not appear *** and lying that she would be in court on July 26, 2021" during the Friday proceedings, and that these lies were later confirmed by her absence on Monday, giving grounds for a finding of direct contempt. As stated above, "a finding of direct criminal contempt cannot rest upon mere opinion or the presumptions of the trial court." *Coulter*, 228 Ill. App. 3d at 1023. While the record demonstrates that the trial court held the opinion that Dr. Nicholson was lying to it on Friday, and it did not believe she was so severely ill where she was unable to be present on Monday, these alone are not sufficient for a finding of direct criminal contempt. See *People v. Randall*, 89 Ill. App. 3d 406, 412-13 (1980) ("[A] finding of direct contempt may not be based on inference or conclusions but only on facts known to the trial judge," and "it is well established in Illinois that perjury and false swearing, although occurring in court and witnessed by the judge, constitute at most indirect[,] not direct contempt [citations], unless the falsity of the statement is admitted by the contemnor.").

¶ 21    In this case, the trial court did not have personal knowledge that any statements by the defendants regarding Dr. Nicholson's medical illness or J&J's efforts to secure her testimony were false. The trial court lacked personal knowledge as to whether Dr. Nicholson was telling the truth about suffering from a medical condition that she alleged occurred *after* she left court on Friday. Ultimately, the trial court inferred and presumed the falsity of the defendants' claims made on Monday from circumstances that transpired on Friday. This was error as a court's reliance on inferences and presumptions is expressly prohibited when finding an individual in direct criminal contempt. *L.A.S.*, 111 Ill. 2d at 543.

¶ 22    Finally, the defendants request that we reassign this case to a new trial judge on remand. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002). This authority includes the power to reassign a matter to a new judge on remand. *Id.*

¶ 23    We decline the defendants' request. "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Id.* at 280. "To conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made." *People v. Vance*, 76 Ill. 2d 171, 179 (1979). "A judge's rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality." *Eychaner*, 202 Ill. 2d at 280. "[T]he party making the charge of prejudice must present evidence of prejudicial trial conduct and evidence of the judge's personal bias." *Id.*

¶ 24    Here, the defendants do not present any evidence of the trial judge's alleged bias from any extrajudicial source but instead base their claim on the trial judge's action during the trial itself. In this regard, the United States Supreme Court has stated the following:

11

"[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Emphases in original.) *Liteky v. United States*, 510 U.S. 540, 555 (1994).

¶ 25    The defendants refer to various comments made during the trial that they believe call into question the trial judge's impartiality. Specifically, the defendants point to the trial judge's comments that Dr. Nicholson had "lied *** right to my face"; that she had acted "smugly"; that her fear of COVID-19 was "a complete farce"; and that "just like every liar," she "gave shifting reasons of why she couldn't come here." They also pointed to comments toward J&J's counsel that "I'm sick and tired of [J&J] trying to bring this up," and that "it wasn't credible" that J&J would have called Dr. Nicholson to testify if it had known about her prior personal commitment and her COVID-19 concerns.

¶ 26    While the trial judge could have more artfully phrased his various criticisms of the defendants, all the evidence that the defendants point to for the alleged bias against them stems from the trial judge's decisions regarding the contempt issue discussed above. The circumstances the defendants cite do not display such a "deep-seated favoritism or antagonism" that would make fair judgment impossible. Instead, the allegedly biased actions of the trial judge arise within the

12

context of his frustration with J&J's handling of the circumstances surrounding Nicholson testifying, not with his overall handling of the trial, and we therefore conclude the defendants have not met their burden of showing judicial bias against them. As a result, we decline to reassign this case to another judge on remand.

¶ 27                                    III. CONCLUSION

¶ 28     For the foregoing reasons, we reverse the orders of the circuit court of St. Clair County finding Dr. Nicholson and J&J in direct criminal contempt; remand for further proceedings, during which all appropriate due process rights are afforded to the parties, on the issue of indirect criminal contempt; and deny the defendants' request for reassignment of the matter on remand to a new trial judge.

¶ 29     Reversed and remanded.

| **Decision Under Review:** | Appeal from the Circuit Court of St. Clair County, Nos. 21-CC-1, 21-CC-2; the Hon. Christopher T. Kolker, Judge, presiding. |
|---|---|
| **Attorneys for Appellant:** | Beth A. Bauer, of HeplerBroom LLC, of Edwardsville, Jessica D. Miller and Geoffrey M. Wyatt (*pro hac vice*), of Skadden, Arps, Slate, Meagher & Flom LLP, of Washington, D.C., and Joseph D. Cohen (*pro hac vice*), Porter Hedges LLP, of Houston, Texas, for appellants. |
| **Attorneys for Appellee:** | James A. Gomric, State's Attorney, of Belleville (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |