2026 IL App (1st) 250040
No. 1-25-0040

SIXTH DIVISION
March 31, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 20241600300 |
| TONY COLE, | ) ) | Honorable Christ Stanley Stacey, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     On December 3, 2024, following a jury trial in his eviction case, the circuit court found appellant Tony Cole in direct criminal contempt (see 720 ILCS 5/1-3 (West 2024)) after he threatened to have Judge Christ Stacey "prosecuted." This comment came after Cole continuously interrupted the judge, accused the judge of corruption, and suggested the judge "bought" his judicial seat. On appeal, Cole argues the judge's contempt order was a retaliatory ruling intended

to punish him for asserting his first amendment right (see U.S. Const., amend. I) to express his frustrations with the judge's handling of his case. For the following reasons, we vacate the contempt order of the circuit court.

¶ 2                                    BACKGROUND

¶ 3     On April 24, 2018, Cole entered into a leasing agreement with Jin Lee for an apartment at 1205 N. Milwaukee Avenue, Unit 2, in Chicago (Unit). As part of this agreement, Cole was required to pay Lee $1,850 a month in rent, along with $300 a month in pet rent, for a total of $2,150. During the tenancy period, Cole and Lee occupied the Unit together. On December 12, 2023, 1205 N Milwaukee LLC (Landlord) purchased the building from Lee and assumed the lease for the Unit. When the Landlord did not receive a rent payment in January 2024, it began eviction proceedings against Cole and Lee. In its complaint, the Landlord only sought possession of the Unit and not any unpaid rent. Judge Stacey presided over the proceedings in the circuit court.

¶ 4     As the matter proceeded to trial, gas service was terminated at the Unit. In November 2024, prior to the trial date, the circuit court ordered Cole to allow the Landlord access to the Unit to restore gas service. On the day of trial, gas service was not restored. The Landlord filed a petition for rule to show cause, alleging Cole did not comply with the judge's prior order, as he gave their representative one key that did not fully unlock the door to the Unit. Cole filed a motion to dismiss the case. In his motion, Cole argued while the judge gave the Landlord multiple opportunities to restore service, they refused to do so and instead pursued a "frivolous retaliation eviction." The judge denied Cole's motion and continued the Landlord's petition until after the trial.

¶ 5     During a jury instruction conference on November 22, 2024, the circuit court removed Cole from the courtroom for disrupting the proceedings. The judge then spoke with counsel for the Landlord and developed a draft order of the instructions for Cole to review. When Cole returned

2

to the courtroom, he refused the opportunity to review the draft order. Counsel then revised the instructions and e-mailed them to Cole for his review on November 25, 2024. Before trial on December 3, the judge asked Cole if he reviewed the updated instructions. Cole denied receiving the e-mail and said the judge was a "rubber stamp" for the Landlord. Cole further stated the judge denied all his discovery requests, motions to subpoena witnesses, and motion to depose the Landlord's agent, Joseph Faulkner, while allowing the Landlord to call Faulkner as a trial witness.

¶ 6    At trial, Cole asserted his lease with Lee included a prepayment of $20,000. This prepayment was part of an oral agreement which would allow Cole to purchase the building from Lee for $475,000. Cole further claimed he paid Lee a deposit of $3,600, which the Landlord failed to apply to his back rent. Cole claimed the Landlord did not personally provide him notice of the change in ownership or a five-day notice of eviction. The Landlord then called Faulkner to testify. On direct examination, Faulkner stated the Landlord acquired the property on December 12, 2023, and recorded it on December 15, 2023. The Landlord sent a notice of change of ownership, dated December 21, 2023, to Cole via certified mail, posted a copy on the property, dropped a copy in the mail slot for the Unit, and e-mailed an electronic copy to Cole. The judge entered both the deed and change of ownership documents into evidence over Cole's objections.

¶ 7    Faulkner testified that he personally delivered a five-day notice of eviction, dated January 27, 2024, to the Unit. The affidavit of service provided Faulkner delivered the notice to Lee, who remained at the Unit following the sale of the building. On February 16, 2024, the Landlord filed the eviction complaint with the circuit court. The sheriff of Cook County completed service of process on April 18, 2024. On cross examination, Faulkner stated Lee was a codefendant in the case, as he was an occupant in the Unit at the time of the suit. Faulkner further admitted the initial 2018 lease included a prepayment of $20,350. Cole sought to ask about a prior eviction case

3

between him and Lee. Counsel for the Landlord objected based on a motion *in limine* Cole filed that the judge granted. The judge sustained the objection, leading Cole to accuse the judge of continuing to help counsel.

¶ 8    The judge excused the jury and informed Cole that he continually made contemptuous comments about the judge being biased and aiding the plaintiff. The judge specifically noted that Cole used the word "corruption" in the presence of the jury. He stated Cole's comments constituted an "attempt" of direct criminal contempt and warned him that, if he did it again, he would go to jail. The judge asked Cole if he would stop making disparaging remarks in front of the jury, to which Cole responded that the judge was "helping the [Landlord]." The judge called for the jury, and Cole continued his cross-examination. Cole asked Faulkner about his involvement with a separate LLC from the Landlord. Counsel objected, stating the questioning was irrelevant. The judge sustained the objection, and Cole accused the judge of trying to persuade the jury that the Landlord had standing against him. Cole then asked Faulkner about the Landlord's other properties. Counsel objected based on relevance. When the judge sustained the objection, Cole accused the judge of "rubber-stamping" whatever counsel stated. The judge warned Cole he was "getting close" to contempt, and Cole accused the judge of provoking him. Cole ended his examination, the parties conducted their closing arguments, and the judge dismissed the jury to deliberate.

¶ 9    During deliberation, the jury submitted a question to the judge asking whether the recipient of service needed to be a tenant on the lease. As the parties discussed the question, the judge read the Illinois statute on service (735 ILCS 5/9-211 (West 2024)). Cole again accused the judge of "rubber stamping," saying "whatever [counsel] says, [the judge] agree[s] with it." When the judge read the proposed answer to the parties, Cole stated "[the language] doesn't matter at this point.

4

[The judge has] been ruling in the [Landlord]'s favor for like nine, 10 months." Cole continued, stating, "[counsel]'s not a real, professional lawyer. Everything I do, he [does], and you allow him to do it." The judge responded, "Okay. It's established that you're the best lawyer on the planet." Cole replied, "Yeah, I am. That's why you stopped being a lawyer and paid for that seat." When pressed on the comment, Cole stated "whatever [counsel] says, you continue to rubber stamp." The judge read the answer into the record, stating it counts as being served "if the recipient was the tenant or some person of the age of 13 years or older residing on or in the premises." When the jury returned, they issued a verdict in favor of the Landlord.

¶ 10    The judge then proceeded to the Landlord's petition. Faulkner testified that the circuit court's prior order required Cole to provide him with keys sufficient to access the Unit. Faulkner arrived at the Unit with an employee for Peoples Gas and two security officers. He knocked on the door and attempted to use the key Cole provided to unlock the door. The door to the Unit contained a bottom lock and a dead bolt. While the key unlocked the bottom lock, it did not unlock the dead bolt. During this time, the employee went into the basement of the building to turn on the gas meters. The employee needed to access the Unit, however, to ensure there was not a gas leak. While Faulkner did not see Cole, he sent one of the officers to meet him. Cole went downstairs to the basement to video record the security officer before returning to the Unit. When the employee could not access the Unit, he told Faulkner they would need to turn off service for the entire building.

¶ 11    While Faulkner was still on the stand, the judge asked Cole what occurred when Faulkner arrived at the Unit. Cole answered he saw the truck for Peoples Gas and e-mailed the judge that they arrived. He then went downstairs with his camera to speak with the security officer. Cole showed the recorded video to the judge and noted one of the people in the background previously

informed him that Peoples Gas needed to dig into the ground. Cole stated that because Peoples Gas did not dig into the ground, they did not restore service to the Unit. He further asserted he gave the Landlord the key to the Unit and that they made a copy. Cole confirmed the Unit has three locks, and the key he gave the Landlord unlocked all of them. He asserted the Landlord was lying and that the employee was not an authorized employee of Peoples Gas.

¶ 12    The circuit court found both parties admitted the gas company arrived at the Unit. Cole objected, stating he only said the truck was outside of the Unit. Counsel interjected, stating the Landlord previously suggested the judge allowed them to change the locks and provide Cole with a copy of the new keys to facilitate access. As part of this, Cole would need to ensure his dogs were secured as Peoples Gas employees will not enter a property if there are loose animals. The judge asked Faulkner if he personally attempted to access the Unit using the keys Cole provided. Faulkner testified he received two copies of the key. Both he and the security officer tried the key, yet it did not work. Faulkner testified this occurred around 1:30 p.m. The judge noted it received an e-mail from Cole at 1:50 p.m. stating he was going to leave the Unit. The judge found the key did not facilitate access to the Unit and held Cole in indirect civil contempt and had Cole placed in handcuffs. The judge further informed Cole that he would be remanded to the Cook County Jail until he provided the Landlord the key to fully unlock the door to the Unit.

¶ 13    Cole continued to assert the Landlord was lying, that it had the keys to fully access the Unit, and that the judge knew they were lying. He then stated the Landlord could go to the Unit, get on FaceTime, and show that the key opened the door. The judge noted Cole was "crazy screaming," to which Cole responded, "you continue to do that." The judge reversed his finding of contempt due to a conflict in testimony, ordered the Landlord to change the locks to the Unit, and restore gas service. The judge asked the sheriff to remove the handcuffs from Cole and informed him not

to mess with the lock. Cole replied, "this is going to be a lawsuit." The judge ordered the Landlord to place a copy of the new key inside of a lockbox for Cole to access. Cole continued, commenting, "I'm going to make sure you get prosecuted."

¶ 14    The circuit court then found Cole in direct criminal contempt for saying, "I'm going to make sure you get prosecuted." As the sheriff placed Cole back in handcuffs, he stated "make sure my kids get from daycare…their mother is out of state." The judge did not respond to this statement. The judge continued, stating Cole was in contempt for saying he was "going to prosecute me, interrupting me repeatedly, [and] by accusing me, the whole case of being inappropriate." The judge sentenced Cole to seven days in Cook County Jail for his comments, explaining:

> "I am considering the court's, I would say pretty patient attempts to try to deal with you, and I am taking into account of sentence your whole history in this case saying the court was lying, saying I spent a large sum of money on my judicial campaign in a tone that insinuated it's unethical for candidates to spend money on campaigns, for telling me that I was stupid and that I had to buy my seat, to call me biased at every turn, and yet all I was trying to do is get this case to trial. You interrupt others. You've told the Court to shut up on prior occasions. You constantly rehash matters previously we ruled on, even when ordered not to file motions to reconsider without leave. You continue to do it, and I continue to try and be as fair as I can, but your last comment that you're going to prosecute me shows nothing but utter contempt, and for that, it's seven days."

We note that the transcript of proceedings does not show that Cole told the Judge to "shut up" or that he was "stupid."

¶ 15    On December 5, 2024, the circuit court amended the contempt order, noting that Cole would not receive "day for day" credit on his sentence. This appeal followed.[1]

¶ 16                                JURISDICTION

¶ 17   The circuit court found Cole in direct criminal contempt on December 3, 2024, and subsequently sentenced him to seven days imprisonment at the Cook County Jail. Cole filed his timely notice of appeal on December 19, 2024. This court has jurisdiction pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016). See *In re Marriage of Gutman*, 232 Ill. 2d 145, 153 (2008).

¶ 18                                 ANALYSIS

¶ 19   It is well established in Illinois that courts have the inherent power to punish contempt, as such power is essential to the maintenance of the court's authority and administration of judicial power. *People v. Simac*, 161 Ill. 2d 297, 305 (1994). Direct criminal contempt is defined as "conduct which is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute." (Internal quotation marks omitted.) *Id.* Criminal contempt is punitive in nature and is intended to punish a contemnor for past contumacious conduct. *People v. Warren*, 173 Ill. 2d 348, 368 (1996).

¶ 20   A finding of criminal contempt is intended to vindicate the dignity and authority of the court. *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL 113482, ¶ 62 (citing *Simac*, 161

---

[1]On July 7, 2025, this court entered an order taking the case on the record and Cole's *pro se* brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

Ill. 2d at 305-06). The principal specific societal norms vindicated in criminal contempt proceedings are the following: (1) judges and other court officials are entitled to respect while performing their judicial duties, (2) judicial proceedings should be conducted in an orderly manner, (3) court orders should be obeyed, and (4) individuals should not commit fraud upon the court. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 45 (1990) (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 303 (1947)). Perhaps the most readily recognizable example of criminal contempt is an outburst on the part of the spectators or litigants that disrupts judicial proceedings. *Id.*

¶ 21    Direct criminal contempt is contemptuous conduct occurring in the very presence of the judge, making all the elements of the offense matters within the judge's own personal knowledge. *People v. Johnson & Johnson*, 2022 IL App (5th) 210250, ¶ 13 (citing *People v. L.A.S.*, 111 Ill. 2d 539, 543 (1986)). A court may find an individual in direct criminal contempt summarily because all elements are before the court; consequently, the usual safeguards of procedural due process are not required. *Id.* Because direct contempt occurs in the presence of the judge, the trial court acts instantly to impose corrective steps and gain control of the proceedings. *People v. Coupland*, 387 Ill. App. 3d 774, 778 (2008). Due process is satisfied if the circuit court advises the contemnor of the offending conduct before imposing sentence, makes a sufficient record for review, and provides the contemnor with an explanation of the right to appeal. *Id.* On appeal, the standard of review for direct criminal contempt is whether there is sufficient evidence to support the finding of contempt and whether the judge considered facts outside of the judge's personal knowledge. See *id.*

¶ 22    On appeal, Cole first contends the judge's contempt orders violated his due process rights because he was not given a hearing. Illinois courts, however, provide that direct contempt may be

dealt with in summary fashion, without the formality of pleadings, notice, or hearing because the judge witnessed the offending conduct. *City of Chicago v. Bryan*, 2022 IL App (1st) 211074, ¶ 26; *In re Parentage of A.C.*, 2024 IL App (1st) 232052, ¶ 20. This is in contrast to indirect criminal contempt where the contemnor is "generally entitled to all of the constitutional protections and procedural rights afforded to other criminal defendants." (Internal quotation marks omitted.) *A.C.*, 2024 IL App (1st) 232052, ¶ 20. Cole does not dispute he stated he would have the judge prosecuted. In his brief, he asserts he was held in contempt "solely for declaring, in court" that he intended to file a lawsuit against Judge Stacey. We note that when a party makes a contemptuous statement in the presence of the judge, he can be held in direct criminal contempt without the usual procedural due process safeguards. *People v. Hixson*, 2012 IL App (4th) 100777, ¶ 13 (citing *L.A.S.*, 111 Ill. 2d at 543).

¶ 23     Next, Cole argues his statement was protected speech under the first amendment to the United States Constitution. The United States Supreme Court declared that freedom of speech should not be impaired through the exercise of a court's contempt power unless there is " ' "no doubt that the utterances in question are a serious and imminent threat to the administration of justice." ' " *D'Agostino v. Lynch*, 382 Ill. App. 3d 960, 971 (2008) (quoting *People v. Hathaway*, 27 Ill. 2d 615, 618 (1963), quoting *Craig v. Harney*, 331 U.S. 367, 373 (1947)). The *Craig* Court held that the vehemence of the language used is not alone the determining factor for using the power of contempt, rather the reaction from the language must "immediately imperil" the administration of justice. *Craig*, 331 U.S. at 376. Following the precedent set by *Craig*, the Illinois Supreme Court stated the first amendment forbids the punishment by contempt for comment on pending cases in absence of a showing that the utterances created a "clear and present danger" to the administration of justice. *Hathaway*, 27 Ill. 2d at 618. The "clear and present danger" test

applies to conduct dealing with in-court conduct by individuals. *D'Agostino*, 382 Ill. App. 3d at 971.

¶ 24 In his order, Judge Stacey held Cole in direct criminal contempt for stating he would "have [the judge] prosecuted." Judge Stacey issued his sentence due to Cole "attributing prosecutable conduct and disrespectful interruptions on the part of the court." Specifically, Cole accused Judge Stacey of corruption in front of the jury, accused him of "buying his judicial seat," and made other numerous interruptions. The record shows in finding Cole in contempt, Judge Stacey did not consider any facts outside of his knowledge, as all these statements occurred in his presence. Our inquiry here is whether sufficient evidence existed in the record to support the finding that Cole's statement to present a "clear and present danger" to the administration of justice.

¶ 25 Comments that are systematically designed to thwart the judicial process constitute a "clear and present" danger to the administration of justice. *People v. Goss*, 10 Ill. 2d 533, 543 (1957) (*per curiam*) (citing *Craig*, 331 U.S. at 367). In *Goss*, a detective testified in a divorce case that he saw the wife frequent the home of another man over a series of nights. *Id.* at 536. The man in question appeared on a television program and called the detective a " 'professional sneak and liar.' " *Id.* at 536-37. He further claimed in subsequent appearances on the show that the family members of the husband who testified at the divorce case had " 'hoodlum connections.' " *Id.* at 537. The judge found the man in contempt, noting the utterances were false and made to bring distrust upon the witnesses in the divorce proceedings and make them afraid of testifying. *Id.* at 538. On review, our supreme court upheld the finding, reasoning that the outcome of the divorce case depending heavily on the testimony of the people who were attacked and that the man publicly announced his intention to affect that outcome. *Id.* at 541.

¶ 26    In *D'Agostino*, the defendant filed a motion for a substitution of judge, where he alleged the judge could not be impartial to his case because the judge was bribed by the plaintiffs. 382 Ill. App. 3d. at 961. The motion alleged the plaintiffs were members of an Italian mafia family and that the judge " 'exploit[ed] litigants for [his] own financial gain.' " *Id.* at 963. The defendant filed a second motion for substitution, repeating the same allegations. *Id.* at 964. The plaintiffs responded to the motions, requesting the judge to find the defendant in contempt as his " 'defamatory and unsubstantiated' " allegations constituted a direct attack on the dignity and authority of the court. *Id.* at 965. The motions were heard by a different judge who found the defendant in contempt, stating the motions disrupted and disrespected the court. *Id.* at 967. On appeal, the defendant asserted the judge found him in contempt simply because he made inflammatory assertions in his motions. *Id.* at 968.

¶ 27    The *D'Agostino* court found the defendant's motions went beyond protected judicial criticism and were calculated to interfere with the judicial proceedings, as they made unsubstantiated allegations that the judge received bribes from an Italian mafia family. *Id.* at 972. The judge reasoned the allegations in the motions were wholly unsupported by evidence and were calculated to interfere with the plaintiffs' efforts to pursue their case. *Id.* It held that allegations of misconduct which are wholly unsupported by evidence and were calculated to interfere with the judicial proceedings constituted criminal contempt. *Id.*

¶ 28    Here, Cole's utterances do not show a calculation to interfere with the court's proceedings — rather they show a mounting frustration with the judge's provocations as he attempted to present his case.

¶ 29    Before citing one with contempt, the judge must find that the alleged contemnor's conduct was willful. *Simac*, 161 Ill. 2d at 307. Whether the contemnor's mental state is intentional may be

inferred from the surrounding circumstances and the character of the party's conduct. *Id.* The record shows Cole's frustrations building throughout the proceedings. Cole repeated the notion that the judge was a "rubber stamp" for the Landlord's counsel eight times. He continuously voiced his frustration that the judge constantly sided with counsel throughout the proceedings prior to accusing the judge of corruption. After the judge excused the jury and warned him about his comments, Cole stated he was going to present his case, but the judge needed to be "fair and impartial." When the judge claimed it was, Cole again stated he was "helping the [Landlord]." After the judge asked would Cole "behave," Cole responded, "why do you keep asking me the same questions and provoking me." When the parties discussed the proposed answer to the jury's question, Cole did not accuse the judge of paying for his seat until the judge quipped that Cole was "the best lawyer on the planet." The judge accused Cole of "crazy screaming," to which he responded it continued to provoke him. When the judge found Cole in indirect civil contempt, Cole was placed in handcuffs as he proclaimed the Landlord lied about the keys. A review of the record shows Cole's rising frustration that was exacerbated by the remarks and responses of the judge. Cole's frustration reached a tipping point after he was hand cuffed based on an initial finding of indirect civil contempt that the judge later reversed.

¶ 30   In *In re Little*, 404 U.S. 553, 554 (1972) (*per curiam*), the defendant alleged the trial judge in North Carolina was biased against him after the judge denied his motion for a continuance. The defendant alleged the judge was prejudiced against him, and as a result, he was a political prisoner. *Id.* The court held the defendant in contempt, as it felt the statements were disrespectful and tended to subvert and prevent justice. *Id.* The United States Supreme Court reversed the finding, stating the record did not show that the statements in any way actually disrupted the court proceeding. *Id.* at 555-56. The judge noted that given the context of the case, the defendant was forced to argue

13

his own case. *Id.* at 555. As such, he was entitled to as much latitude in conducting his defense as any other lawyer would. *Id.* The judge emphasized that the vehemence of the language used is not alone the measure of the power of contempt, rather the reaction it creates " 'must constitute an imminent, not merely a likely, threat to the administration of justice.' " *Id.* (quoting *Craig*, 331 U.S. at 376). Cole's statements were certainly crude and unwise, yet they do not show an intent to create a "clear and present danger" to the administration of justice. Comments on pending cases, even if unfair and inaccurate, is not to be adjudged contemptuous unless it constitutes an " 'imminent peril' " to the administration of justice. *Goss*, 10 Ill. 2d at 544.

¶ 31    In *Craig*, a trial judge in Texas granted the plaintiff's motion for an instructed verdict in an eviction case. 331 U.S. at 369. The judge instructed the jury to return a verdict for the plaintiff, yet the jury ruled in favor of the defendant twice. *Id.* The jury returned on the fourth time with a verdict in favor of the plaintiff, stating it acted "under coercion of the court." *Id.* Days before the defendant filed a motion for a new trial, the local newspaper published an editorial and news stories criticizing the judge's ruling as a " 'gross miscarriage of justice' " and that it "properly brought down 'the wrath of public opinion' " upon its head. *Id.* at 369-70. The trial court found the reports and editorial were designed to falsely represent to the public the nature of the proceedings and influence the court in its ruling on the motion for new trial. *Id.* at 370. The United States Supreme Court disagreed, noting while it is plausible the editorial was part of a plan to "poison the public mind, to cause a march on the court house, or otherwise so disturb the delicate balance" of the proceedings, it does not rise to the level of any "imminent or serious threat to a judge of reasonable fortitude." *Id.* at 375; see *Pennekamp v. Florida*, 328 U.S. 331, 334 (1946) ("The evil consequence of [the] comment must be extremely serious and the degree of immense extremely high before utterances can be punished." (Internal quotation marks omitted.)).

14

¶ 32 Judges are supposed to be people of fortitude and able to thrive in a hardy climate. *Craig*, 331 U.S. at 376. Where the alleged contemptuous statements are directed at the court, and not the parties or witnesses, we must attribute a special degree of fortitude, as *Craig* requires us to presume judges are not readily susceptible to intimidation. *Goss*, 10 Ill. 2d at 542. The exercise of the power to punish contempt is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions. *Simac*, 161 Ill. 2d at 306 (citing *Cooke v. United States*, 267 U.S. 517, 539 (1925)); see *In re Inquiry Concerning Perry*, 641 So. 2d 366, 368 (Fla. 1994) (*per curiam*) ("it is critical that the exercise of [the] contempt power never be used by a judge in a fit of anger, in an arbitrary manner, or for the judge's own sense of justice").

¶ 33 Here, we have a *pro se* litigant with two young children in day care that is facing the loss of his residence — a residence that has been without gas service during the colder months of the year. For courts to maintain public trust, it is imperative that judges work to not provoke those within their courtroom. Particularly in circumstances such as this, where it is not surprising the litigant could become frustrated during the proceedings. In establishing the "clear and present danger test," the United States Supreme Court created a high bar to prevent judges from abusing their power of contempt. Similar to the defendant in *In re Little*, Cole was entitled to as much latitude in presenting his case as any other lawyer. See *Geraty v. Carbona Products Co.*, 16 Ill. App. 3d 702, 708 (1973) ("Although some of the remarks were intemperate and unworthy of an attorney, our Illinois courts have given broad leeway to the in-court statements of an attorney."). Courts cannot utilize the power of contempt to curtail this latitude on account of the language a party may or may not use. *Craig* and its progeny only allow the court to use the power of contempt to punish words that are an imminent threat — not those it may consider rude or disrespectful. We hold that for the circuit court to find an individual in direct criminal contempt for comments directed towards the

judge, the court must determine that the contemnor intended his comments to constitute an imminent threat to the administration of justice. The danger created by the comment must not be remote, or even probable; it must immediately imperil. *Craig*, 331 U.S. at 376.

¶ 34 The facts in this case mirror that of *In re Free*, 2016-0434 (La. 6/29/16); 199 So. 3d 571, 584. In *Free*, a judge in Louisiana presided over a bench trial for a *pro se* litigant charged with not wearing their seatbelt. The judge found the litigant guilty, and upon the litigant asking about an appeal, the judge responded with " 'Go ask the Governor why he won't change it.' " *Id.* at 585. The litigant commented " 'I thought, you know—it was my idea that the courts are the safeguard of the people's rights ***. And I was hoping that you might see your way clear for that, but apparently not.' " (Emphasis omitted.) *Id.* The judge then held the litigant in direct criminal contempt, stating it was " 'very disrespectful and contemptuous' " to comment " 'I thought you would do the right thing, but obviously this court doesn't do that.' " *Id.* At a judicial review hearing, the judge noted in addition to the comment, the litigant was " 'mean muggin' " as he said it. *Id.* at 586. The judge sentenced the litigant to five days in the parish jail. *Id.* at 585. The judge argued the litigant's statement, along with his demeanor, were intended as a direct insult to his intelligence. *Id.* at 590. The Louisiana Supreme Court found the judge erred as the record showed the statement part of a lengthy exchange between the judge and the litigant. *Id.* While the judge notes the litigant's statement was "unwise," it was not contemptuous. *Id.* at 591.

¶ 35 Similarly, while Cole's comments were certainly unwise, they came about as part of a series of conversations between him and Judge Stacey. Throughout the proceedings on December 3, Cole engaged with the circuit court on a series of topics from his motion to dismiss, to the actions of Landlord's counsel, to the content of the Illinois statute of service, and whether Faulkner lied about gaining access to the Unit. As the proceedings continued, the transcript shows both Cole

and the judge exchanged verbal barbs with each other. The exchanges continued to escalate until the judge ordered Cole in handcuffs following a finding of indirect civil contempt. By the time the judge reversed his finding, the frustrations had reached a boiling point. Nevertheless, Cole's final remark does not show an intent to levy an imminent threat upon the judge. We find the record does not show Cole intended his statements to present a "clear and present danger" to the administration of justice and therefore vacate the circuit court's orders finding him in direct criminal contempt and sentencing him to imprisonment.

¶ 36                                    CONCLUSION

¶ 37    For the foregoing reasons, we vacate the circuit court's contempt finding.

¶ 38    Vacated.

---

*People v. Cole*, 2026 IL App (1st) 250040

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20241600300; the Hon. Christ Stanley Stacey, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Tony Cole, of Chicago, appellant *pro se*. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | No brief filed for appellee. |

---